(Decided July 29th, 1859.)

# THOMAS M. WATKINS, (Free Negro,) *vs.* THE STATE.

The Act of 1858, ch. 324, for the punishment of convicted free negroes, provides, that in case of their conviction "of the crime of *simple larceny*, to the value of five dollars and upwards, they shall be sentenced *to be sold at public sale*, as slaves, for the period of not less than two, nor more than five years," and for various other crimes they were to be sold, "either *within* or *beyond* the limits of the State," for certain periods. HELD:

That for the offence of *simple larceny* the court has no power to sentence the party to be sold "*out of the limits of the State;* the only sentence that can be passed is that prescribed by the Act, viz., that the party shall "*be sold at public sale,*" for the prescribed period, and under such sale he may be purchased either by a citizen of the State or a non-resident.

A judgment, as shown by the *docket entry,* "to be sold for the period of five years out of the limits of the State," was *extended* in the *record,* "be sold out of the State of Maryland, *at public sale,* as a slave, for the period of five years, under the provisions of the Act of Assembly in such case made and provided." HELD:

That the judgment as *extended* is *more* than a *technical amplification* of the docket entry; it is not the *same* judgment; its legal effect and intendment are changed by the insertion of the words "*at public sale.*"

The omission of the court, in passing sentence upon a free negro convicted of simple larceny, to direct the sale to *be public,* as required by the Act of 1858, ch. 324, renders the judgment illegal and void.

The effect of a reversal for error in the *judgment itself,* after trial and a proper verdict, is to defeat all former proceedings in the cause.

ERROR to the Criminal Court of Baltimore City.

The writ of error in this case issued out of the Circuit Court for Baltimore city, on the 9th of April 1859, and directed to the Criminal Court of Baltimore city, brings up for review the judgment of the latter court (STUMP, J.) pronounced upon the plaintiff, in error. The indictment and judgment are fully stated in the opinion of this court.

The cause was argued before LE GRAND, C. J., ECCLESTON and BARTOL, J.

*Chas. E. Phelps* for the plaintiff in error:

The leading question presented upon this record is, whether upon conviction of a free negro for larceny, the court is authorized to sentence him to be sold out of the limits of the State? The whole argument for the plaintiff in error in support of the negative of this proposition, will refer, as its basis, to the elementary principle: "That no other punishment can be inflicted than such as the laws prescribe; that, consequently, judges in the exercise of their discretion can invent no new penalties to suit the offence, or to gratify their own caprices, and that, therefore, they can inflict no punishment which did not exist at common law, except in those cases where the law has expressly allowed its infliction." 1 *Chitty's Cr. Law,* 710, 712. 4 *Bl. Comm.,* 377, 378. Since neither *slavery* nor *banishment* are to be found in the *common law* catalogue of penalties applicable to the crime laid in this indictment, and as the sentence in this case undertakes to inflict *both,* it follows that the judgment in question must stand or fall only upon the Act of 1858, ch, 324, entitled "An Act to modify the punishment of free negroes convicted of larceny and other crimes in this State."

1st. This statute (sec. 1) enumerates *eight* distinct crimes, or classes of crimes, to each of which a different punishment is affixed, varying in severity according to the degree of criminality. In *five* of these cases, the court is authorized in its discretion to sentence the convict to be sold as a slave, "either within or beyond the limits of the State." In the *three* re-

maining cases the court is authorised, generally to sentence the convict "to be sold as a slave" for the specified term of years. The case of larceny is one of these three. From this simple analysis it is perfectly plain that in the present case the court below has *assumed* a discretion not given it by law, but on the contrary, *positively withheld* by implication. *Expressio unius est exclusio alterius.* 5 *Rep.*, 119. 8 *Barn. & Cress.*, 74, *Rex vs. Bolton. Dwarris on Statutes,* 707. It is scarcely necessary to suggest that this statute should be strictly construed for a double reason. It is both *penal* and in *derogation of the common law.* Apart from these reasons, "Acts which abridge the liberty of the subject ought to receive the *strictest* construction." 4 *Bing.*, 183, *Looker vs. Halcomb. Dwarris,* 749. On the other hand, if it were necessary, it could easily be shown that even the most lax and liberal interpretation could not justify such a sentence as is now under review. The Act, as has been seen, provides for the punishment of numerous crimes of various grades. It is but reasonable to impute to the Legislature, *a priori,* an intention to do the common justice of adapting the degree of punishment to the grade of the offence. Accordingly, looking at the Act, we find crimes of a higher grade, such as *robbery, horse-stealing, vessel* and *negro stealing* and *enticing or harboring slaves,* punished with a longer term of slavery, and with the discretion in the court to add *banishment* to slavery. Upon the other hand, crimes of a lower grade, such as *larceny, malicious stabbing, &c.,* of beasts, *stealing under the value of* $5, or *stealing under the value of* $1, *accompanied with breaking into out-houses, &c.,* are assigned a shorter term of slavery, and the power of banishment is *withheld.* That the crimes last mentioned are considered by the Legislature to be crimes of comparatively low degree, is obvious, not only from the Act itself, but from the Act of 1809, ch. 138, sec. 6, in *pari materia.* Now, if a sentence upon conviction of simple larceny, like that now in question, can be supported at all, it must be upon the theory that the *unqualified* power to sell as a slave generally includes the absolute power of disposition over the person, and, consequently, the right of removal from the State.

It cannot be upon the theory that in such cases the court has *discretion* to restrict or not the ownership to the State limits, for that discretion, as we have seen, is peremptorily negatived by the pregnant silence of the Act itself. But as the Legislature has clearly manifested its appreciation of the distinction between slavery *within* and slavery *without* the State, the construction now contended against would involve the Legislature in the strange and stupid injustice of having actually discriminated *against* petty offences in *favor* of crimes of a graver and more atrocious character. In other words, a negro convicted of wilfully burning down a court-house, or of enticing slaves to run away, has a chance of being kept comfortably at home by a merciful application of the discretion committed to the court, while a negro who pilfers a ham or a jewsharp, is to be hopelessly assigned to the clutches of the speculator, and has absolutely no chance of escape from a doom which everybody knows is equivalent to perpetual slavery, aggravated by banishment. "*Ea est accipienda interpretatio quæ vitio careat.*" *Dwarris*, 689. But as the *strict construction* is the only proper construction, the court has no right either to take from or to add to the plain expressed terms of the law. Even if the words were, on their face, ambiguous, and even if the cumulative reasons which, in this case, demand a rigid construction, were all out of the way, the court could not take "the liberty to introduce words into or exclude words from the clause, but would be bound to construe the words which the clause contains." 6 *Barn & Cress.*, 174, *Bloxam vs. Elsee. Dwarris*, 718. This is a case, however, where, to use the words of Lord Coke, in 2 *Inst.*, 533, "the words are plain, without any scruple, and absolute without any saving, and *absoluta sententia expositore non indiget.*" If, therefore, the proper sentence under the law had been passed, the *status* of the convict under it would have been that of a "slave entitled to freedom after a term of years." Now, the "transporting out of this State" of just such slaves, the law of Maryland classes among crimes and misdemeanors, and the Act of 1817, ch. 112, entitled, "An Act to prevent the unlawful exportation of negroes," &c., was passed expressly "*to prevent such heinous*

*offences,* and to *punish them when committed,"* and the effi-
cacy of this Act was increased, and its scope enlarged, by the
supplementary Act of 1834, ch. 266.   See, also, the Acts of
1810, ch. 15, sec. 3, and 1856, ch. 154, sub. ch. 5, sec. 133.
The judgment in this case is not only a piece of arbitrary ju-
dicial usurpation, but inasmuch as it gratuitously deprives this
negro of the protection of the laws just cited, the benefit of
which is expressly secured to him by the 3rd Art. of the De-
claration of Rights, it assumes the graver aspect of a cruel or
careless violation of a sacred and chartered right.   But the
last vestige of a doubt, if any could exist on such a question,
is entirely removed by a reference to previous legislation.
The Acts anterior to that of 1858, *in pari materia,* upon the
subject of penal slavery, are 1831, ch. 323, secs. 1, 3, 4; 1842,
ch. 281; 1847, ch. 309, secs. 3, 5, and 1849, ch. 461.   A sin-
gle reference to these statutes is enough to show that where
the Legislature directs, in general and unqualified terms, the
sale of a negro, *"as a slave"* for a *limited period,* a sale re-
stricted to the State is always understood, and that, on the
other hand, whenever the intention of the Legislature is to
*banish* as well as to enslave, such intent is always clearly ex-
pressed in plain and positive terms.   See 10 *Rep.,* 138,
*c.  Dwarris,* 717.   It is submitted, therefore, that in any as-
pect of the case, and upon every principle of interpretation,
the judgment is erroneous: 1st. Upon the *ipsa verba,* the strict
and immediate letter of the law.   2nd. *Ex visceribus actus,*
upon a rational and comprehensive reading of the purview
looking to the legislative intent, as apparent from it and from
the justice of the case.   3rd. Upon the still broader construc-
tion of the whole law of Maryland, *in pari materia.*

2nd. But this is not all.   The judgment, as pronounced,
and as recorded in the prisoner's presence, did not comply
with the law with respect to the *manner of the sale,* and this
imperfect and illegal sentence was actually sent to the sheriff
for execution, to the manifest prejudice of the prisoner.   It is
claimed that the subsequent addition of the statutory words
*"at public sale"* in the formal record, is nothing more than a
mere technical amplification of the docket entry.   The ques-

tion is submitted to the court whether it is not, on the contrary, an *ex gratia* and unwarranted interpolation of *matter of substance*—an *ex post facto* clerical amendment of an incurable judicial blunder. 3 *British Crown Cases*, 301, *Queen vs. Hartnett, et al.* It is deemed particularly important that this point should be settled, in view of the growing disposition manifested in some courts of criminal jurisdiction, to tamper with their records, and to dress them up for the inspection of the appellate court, in a garb manufactured for the occasion.

3d. It remains only to consider the *effect of a reversal*, and the future disposition of the case. The principle is, that "when the *judgment* is erroneous, that and *all former proceedings* in it, in case of a conviction, are defeated by the reversal." 1 *Chitty's Cr. Law*, 755. 1 *Bl. Com.*, 393. 2 *Just.*, 210. *Hawk., Book* 2, *ch.* 50, *sec.* 18. The first criminal case in this State, in which a *procedendo* was issued, was *State vs. Buchanan*, 5 *H. & J.*, 317. That was an indictment for conspiracy, which came up to the Court of Appeals on a special *demurrer, sustained* by the County court. This court reversed the judgment, overruled the demurrer and *maugre* the opposition of counsel, ordered the court below to proceed with the trial. This case was followed by *Cassel's case,* 2 *H. & G.*, 409; *Dent's case,* 3 *G. & J.*, 8; *Dowell's case,* 3 *G. & J.*, 310; *Negro Evan's case,* 7 *G. & J.*, 290; *Sutton's case,* 4 *Gill*, 494, and *Phelps' case,* 9 *Md. Rep.* 21, which were all cases where the *judgment had been arrested* below on motion and writs of error sued out by the *State*. *Price's case,* 12 *G. & J.*, 260, and *Fearson's case,* 2 *Md. Rep.*, 310, like the case of *Buchanan*, came up on *demurrer*, sustained by the court below. *Root's case*, 10 *G. & J.*, 374, *Capritz's case,* 1 *Md. Rep.*, 569; *Black's case,* 2 *Md. Rep.*, 376; and *Rabb's case,* 7 *Md. Rep.*, 483, each came up upon *motion in arrest,* overruled by the court below. In these cases the indictments were radically defective, (except in Rabb's case, where the court had no jurisdiction,) and the judgments being reversed, no writs of *procedendo* were issued. *Franklin's case,* 12 *Md. Rep.*, 236, (since the Act of 1852, ch. 63,) was like the last named, except that it came up on the traverser's *de-*

*murrer*, overruled by the court below. The court thought the demurrer should have been sustained, and therefore reversed without *procedendo*. The only cases in which judgments *in favor of the State* have been reversed, and writs of *procedendo* awarded, are, *Cochrane's case*, 6 *Md. Rep.*, 400, and *Ford's case*, 12 *Md. Rep.*, 514, both of which came upon *motion in arrest*, overruled below. The case at bar is unlike either of these cases. In *Cochrane's case* the indictment was demurrable. In *Ford's case*, as in *Sutton's case*, there was no "valid and sufficient verdict;" hence in both cases there was a mistrial, and therefore a necessity for a *venire de novo*. Here, however, there is no *mistrial*. The indictment is correct, the verdict entirely regular, and all the proceedings prior to final judgment unexceptionable, both in point of form and substance. The prisoner has been once regularly tried and convicted, by a good and lawful jury; there is no demurrer, no motion in arrest, in short, no reason why "a valid judgment could not have been entered," and there is, therefore, no ground for a *venire de novo*. 12 *Md. Rep.*, 263, *State vs. Reed*. There is but one case reported in Maryland where a court has blundered in passing sentence upon a duly convicted criminal. In *Negro Peter vs. The State*, 4 *H. & McH.*, 3, a slave was convicted of larceny, and Frederick county Court sentenced him to be whipped and pilloried, "and also that Lucy James, to whom negro Peter is a slave, pay unto Daniel Burkhart, the proprietor of the goods and chattels so stolen as aforesaid, the quantity of 48 lbs. of tobacco, and the costs," &c. Here, as in the case at bar, there was neither demurrer, nor *motion in arrest*, and upon writ of error, the General Court reversed the judgment, *without procedendo*. Upon these precedents, it is respectfully submitted that the judgment in this case should be reversed *absolutely*.

*Milton Whitney*, State's Attorney for Baltimore city, for the State:

1st. The first section of the Act of 1858, ch. 324, provides "That in all cases hereafter, where free negroes shall be convicted of the crime of simple larceny, to the value of five dol-

lars and upwards, or as accessory thereto before the fact, they shall be sentenced to be sold at public sale as slaves, for the period of not less than two nor more than five years." Under this provision the court acted, in passing the judgment sought to be reversed. The provision is—"shall be sold as a slave." There is nothing in the language looking to such a limit of the power as is contended for by the plaintiff in error, and the State contends that this power, vested in the court without any restriction, is amply sufficient to authorize the court to order the party to be sold either in or out of the State. It is but one punishment, and that is prescribed by the Act referred to, and is not, therefore, any new penalty invented by the court. The Legislature has not said, in this provision, whether the party shall be sold in or out of the State. Had it been their intention to have confined the court to the selling of the party within the limits of the State, they would have so expressed themselves; but they have used the general expression "shall be sold as a slave;" therefore necessarily leaving it for the court to say, as a part of their judgment, whether the party shall be sold either in or out of the State. It was the intention of the Legislature to relieve the community of such a class of individuals, and were there any other construction adopted, the very evils intended to be remedied by this Act would be increased tenfold. Neither is such judgment opposed to the spirit of our legislation. It is contended that the sale of the party out of the State is a banishment, not authorised by this Act, and that the transporting out of the State of such a slave, the law of Maryland classes among crimes and misdemeanors. The Act of 1817, ch. 112, is relied upon as one passed expressly "to prevent such heinous offences," &c. This Act was passed more effectually to "prevent the *kidnapping* of free negroes and mulattoes," and to prevent the sale out of the State of *slaves* for a term of years, except under the restrictions therein contained, and does not, in any sense, apply to the case contemplated by the Act of 1858, of a *free negro* convicted of a *crime,* and for such *crime* ordered to be sold. And the same remarks apply to the supplementary Act of 1834, ch. 266, cited by the plaintiff in error. And

both Acts present cases of contemplated fraud upon the rights
of the negro, and are passed to prevent the commission of such
frauds, whilst the Act of 1858 is passed to punish the party
convicted of crime.   So, also, the Act of 1810, ch. 15, sec. 3,
only applies to *servants* or *slaves*, and are all intended to reg-
ulate the relation of master and slave in Maryland.   So, also,
of the Act of 1856, ch. 154, which only applies to and regu-
lates the form of a bill of sale of a slave for years.   The Acts
of 1842, ch. 281, 1847, ch. 309, and 1849, ch. 461, are also
relied upon in this connection.   The first is an "Act to pre-
vent the formation and assemblage of secret societies of ne-
groes."   The second is an Act applying to *slaves* running
away from their masters, declaring it felony, and authorizing
the sale of the party, *and his transportation out of the State,*
showing the policy of the Legislature to relieve the commu-
nity of that class of persons.   By the Act of 1831, ch. 323,
sec. 12, the courts are vested with the power of transportation
into another State, and the general policy of the State has
been, to sell them out of the State.   See, also, the Act of 1835,
ch. 200, sec. 3.   And the State contends that in the passing
of the sentence in this case, the court simply exercised its
legitimate authority under the Act of Assembly.   If there
could be any doubt upon this point, under the Act of 1858,
the judgment in this case cannot be reversed, because, if the
court had not the power, under that Act, to sell the party out of
the State, then the presumption is that the court ordered the
party to be sold out of the State under the Act of 1835, ch.
200, the provisions of which clearly and expressly give the
court that power.   The presumption is, in the absence of any
thing upon the record to the contrary, that the court below
acted within the scope of its authority.   Nothing appears
upon the record to show that this party convicted did not come
within the provisions of the Act of 1835, ch. 200.   If there is
no other Act authorizing the action of the court in this case,
the presumption *must* be, that he came under the provisions
of that Act, and that the court exercised its power under the
same.

2nd. The judgment pronounced by the court complies with
the law in respect to the manner of the sale.   The judgment

is, "to be sold for the period of five years," &c. Sold how? In what manner? Why, according to the provisions of the law, "at public sale." The judgment extended in the record is nothing more than a technical amplification of the docket entry, according to its legal meaning and effect. *7 Md. Rep.,* *448, Weighorst vs. The State.*

BARTOL, J., delivered the opinion of this court.

This case comes before us from the Criminal Court of Baltimore on a writ of error issued by the Circuit Court for Baltimore City, and directed to the Criminal Court. The plaintiff in error was indicted for the larceny of a silver watch, valued at six dollars, and, upon a verdict of "guilty," judgment was pronounced by the court, which, it is contended, was erroneous.

As the alleged error is in the judgment rendered, it is proper for us first to ascertain what judgment was, in point of fact, rendered.

In the record transmitted to this court, it is thus stated:

" *Therefore, it is considered by the Court here, that the said free negro, Thomas Watkins, be sold out of the State of Maryland, at public sale, as a slave for the period of five years, under the provisions of the Act of Assembly in such case made and provided.*"

By an amendment of the record, it appears that the judgment rendered by the court and entered upon the docket, was as follows: "*Judgment—to be sold for the period of five years out of the limits of the State, from March 31st,* 1859. Transcript sent."

It is said by the attorney for the State "that the judgment extended in the Record, is nothing more than a technical amplification of the docket entry according to its legal meaning and effect." If this were so, no objection on that ground could be made to the proceeding; it would find its sanction, both in the necessity of the case, and in the approved practice of courts of justice. In *Weighorst vs. The State,* 7 *Md. Rep.,* 450, this court said, "It has always been the habit of clerks to take minutes and docket entries of the court's proceedings, and

subsequently to enter them at length, in technical language, according to the established forms. This is necessary to the dispatch of business, and relieves these officers from the inconvenient, if not impracticable, labor of making correct full records of proceedings as they transpire." That was said in a case where the verdict of the jury, as set out in form upon the record, had the same legal effect and intendment, as the brief entry thereof made by the clerk on the docket.

But, in all cases, great care must be observed to state the proceedings correctly, and not, under pretence of amplifying the docket entries, to alter the substance and legal effect of the verdict rendered by the jury or the judgment pronounced by the court. To allow this, would be to deprive the citizen of the safeguards thrown around his life or liberty by the Constitution and the law, and to subject him to the consequences of the ignorance or mistake of the clerk. Without intending to impute unworthy motives to any one, we have no hesitation in saying that the judgment which was actually rendered by the court in this case, pronounced in the presence of the prisoner, entered upon the docket and transmitted to the sheriff under the solemnity of the court's seal, to be executed by him, is not the same judgment set out in the record and originally transmitted to this court for review. The discrepancy between the two is obvious and material. By the former the sheriff is not directed to sell at *public sale,* but "to *sell* for the period of five years," &c., thus leaving it to the discretion of the sheriff to sell the convict, if he chooses, at private sale, while, by the Act of Assembly, it is the *duty* of the court, in its judgment, to direct a *public* sale. The judge has no power to pronounce any judgment under the Act, except such as the Act declares. He cannot lawfully place in the hands of the sheriff such a discretion, and his omission to direct the sale to be public, would render the judgment, as pronounced, illegal and void, even if it were not so, for other reasons, which will hereafter appear. The strictness which it is the duty of the courts to observe in the administration of the criminal law, is founded on sound reason and the sanction of the experience and wisdom of ages. Nothing is more important than that the

rights of the citizen should be well defined, and the power of courts of justice exactly declared by the law, whose requirements ought to be strictly and rigidly observed; without this, the law itself will cease to be observed or respected.    In the case before us, the plaintiff in error belongs to an abject class of our population, yet they are entitled to the protection of the law.    It is our pride and boast, that while no man is so high as to be above the responsibilities of the law, there is no one so humble as to be beneath its protection.    In this case, whether we consider the judgment as pronounced by the court, or as it is set out at length upon the record, it is not in conformity with the law.    The plaintiff in error was indicted and convicted under the first section of the Act of 1858, ch. 324, which provides, "That in all cases hereafter, when free negroes shall be convicted of the crime of simple larceny to the value of five dollars and upwards, or as accessory thereto before the fact, *they shall be sentenced to be sold at public sale, as slaves, for the period of not less than two, nor more than five years.*"

The judgment of the court is, that the free negro "be sold as a slave, for five years, *out of the limits of the State.*" Now, this is not the sentence directed by the law.    It is obvious from its provisions, that for the offence of simple larceny, the court cannot sentence a party to be sold out of the limits of the State.    The Act enumerates eight distinct classes of crimes, and prescribes the several punishments for them respectively.    In five of them the court is authorized, in its discretion, to sentence the convict to be sold as a slave, "*either within or beyond the limits of the State.*"    In three of them, no such discretion is conferred on the court.    *Simple larceny* is one of these, and, as we have seen by the words of the first section, the punishment prescribed for that offence is, that the convict "*be sold as a slave*" for the specified term of years.

Under the sentence prescribed by the law, the convict may be purchased and held by a citizen of Maryland, or he might be purchased by a non-resident; under that pronounced by the court, the former could not be done.

It is the duty of the court to enforce the law as it is declared

by the Legislature. This has not been done in this case. The judgment was not authorized by the law, and must be reversed.

The effect of the reversal for error in the judgment itself, is properly stated by the counsel for the plaintiff in error in his argument. It defeats all former proceedings in the cause. This will abundantly appear by reference to the following authorities cited by him on this point: 1 *Chitty's Crim. Law*, 755; 4 *Bl. Com.*, 393; *Hawkins, Book 2nd, ch. 50, sec. 19.*

*Judgment reversed.*

(Decided July 29th, 1859.)