## JULIUS HEYWARD v. STATE OF MARYLAND.
[No. 51, October Term, 1931.]

*Decided February 1st, 1932.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, PARKE, and SLOAN, JJ.

*Abram C. Joseph,* with whom was *Daniel C. Joseph* on the brief, for the appellant.

*G. C. A. Anderson, Assistant Attorney General,* with whom were *Wm. Preston Lane, Jr., Attorney General, Herbert R. O'Conor, State's Attorney for Baltimore City,* and *William H. Maynard, Assistant State's Attorney,* on the brief, for the State.

PATTISON, J., delivered the opinion of the Court.

Julius Heyward, the appellant, with one Henry Gorman, was indicted by the grand jury of the City of Baltimore for violation of certain provisions of the criminal code pertaining to lottery, article 27, sec. 336, *et seq.,* of the Code of Public General Laws of Maryland. When the case came up for trial in the criminal court of that city, a severance was granted; and separate trials were had in that court.

The indictment contained eleven counts, but in this case we are interested only in the fourth and fifth counts, upon which the defendant Heyward was found guilty by a jury. In the fourth count he was charged with having in his possession lottery tickets, not for the purpose of procuring and furnishing evidence of the violation of any of the provisions of the law relating to lotteries; and in the fifth count with having in his possession "divers books, lists, slips and records of numbers drawn in a lottery; divers books, lists, slips and records of lottery tickets; divers books, lists, slips and records of money which had been received, and which was to have been received from the sale of lottery tickets, and things in the nature thereof; and divers things by which it was prom-

ised and guaranteed that particular numbers, character, tickets and certificates would, in a certain event, and upon the happening of a certain contingency in the nature of a lottery, entitle the purchaser or holder to receive money, property and evidence of debt; * * * at the time he so there had in his possession the said books, lists, slips and records of numbers drawn in a lottery, books, lists, slips and records of lottery tickets, books, lists, slips and records of money which had been received, and which was to have been received from the sale of lottery tickets, and things in the nature thereof, and things by which it was promised and guaranteed that particular numbers, characters, tickets and certificates would, in a certain event, and upon the happening of a certain contingency, in the nature of a lottery, entitle the purchaser or holder to receive money, property and evidence of debt, not having the same in his possession for the purpose of procuring and furnishing evidence of the violation of any of the provisions of the law relating to lotteries. * * * "

Upon the jury's verdict of guilty on the above counts, the defendant was sentenced by the court to pay a fine of $1,000, and be imprisoned for the term of sixty days in the city jail. It is from that judgment of the court that the appeal in this case was taken.

The State, in support of the charges brought against the defendant, placed upon the stand Sergeant Edward L. Hitzelberger, who testified that he was from the Northwestern District, and that, as a result of certain complaints and information received by him, he, for several mornings prior to May 20th, 1931, watched the movements of Heyward in respect to or in connection with 1716 Brunt street; and on May 20th, 1931, about eleven in the morning, he went to 1716 Brunt street. A man walked in the house and he walked in with him, behind him. Witness then walked to the back room and there were a man by the name of Gorman (Henry Gorman) and two others. In the meantime he had placed Officer Bradley at the rear and had told one of the men to go down and let Officer Bradley in the house, which

he did. Witness told Bradley to stay at the front door, and they waited there for about a half an hour, knowing that he always visited this house in the morning. While they were waiting there, Heyward came there, and witness placed him under arrest and took him to the station house. Witness sent him to the station house in the patrol wagon, and witness got permission from Heyward to drive his car to the station house. On driving the car down there he found a lot of lottery slips and books on the floor of the car, and when the turnkey searched Heyward at the station house, he found slips on him, and envelopes with money in them, which he had collected from going around to the various pick-up stations. Witness was there when the turnkey was searching him. Thereupon the witness was shown some forty or fifty little envelopes with figures on the outside which he testified in some instances contained money.

The State then offered in evidence the papers which were found upon Heyward after his arrest at the station house. An objection to the admission of these papers in evidence was overruled. This ruling constitutes the first exception to the admission of evidence, though it appears in this record as the second exception. The first was to the action of the court in refusing to grant the prayer in defendant's petition, filed and heard before the commencement of the trial of the case upon its merits, asking that the papers, slips, and books found in defendant's car, as well as the slips and papers found upon him after his arrest at the station house, then in the possession of the State, be returned to the defendant.

The witness then testified that he had been working on lottery cases of this character about eighteen months, and that within that time he had handled some six hundred cases. He was then asked: "Will you please tell * * * just how a lottery is operated, based upon your experience " An objection made to this question was overruled. The State, at the request of the defense, reframed its question, and the witness was asked: "Will you tell the gentlemen of the jury just how a lottery is operated based upon your experience in such things?" An objection to this question was likewise

overruled, and to this ruling an exception was noted, which appears in the record as the third exception. The witness then answered, saying: "Well, it is three numbers played. We will take three four nine, or eight six nine, or seven two one. Any three numbers. They pay five hundred to one. In other words, if you put up a penny you win five dollars. The writer gets a commission of ten per cent. from the winnings, which nets you four dollars and fifty cents for your cent. He also gets twenty-five per cent., some of them pay twenty, and some twenty-five and some thirty-five." The court then asked: "Now, are they all alike?" And the answer was: "No, sir. Some of them pay five hundred to one and some of them pay six hundred to one, and then—" At this point the court, interrupting the witness, said: "Well, I will not permit the general testimony. I will strike out all that." Question: "Well, now, Sergeant, come on down to my question and tell me how a lottery is operated?" There was an objection to this question and the court replied: "I think I shall rule out that testimony." It will be seen that the witness in the third exception was permitted to answer the question as to how a lottery was operated, but thereafter the court struck out the answer involved in that exception. Consequently, the third exception is not before us.

The witness also testified that he had watched Heyward for two days; that Heyward was in and around 1716 Brunt street; he would leave his car parked at Laurens and Brunt Streets, and then walk down Brunt Street to the house about half a block, and go in; Heyward did this about 11 o'clock each of the two days that he watched him. The witness, when asked, "What, if anything, did Heyward say when he was placed under arrest?" replied: "He asked me to pass him up and he would not come around there any more."

The books the witness found in the car were then offered in evidence, and, after an examination of them by the court, they were admitted. After the admission of these books, the court said: "I will grant you an exception, of course, to the admissibility of these books, Mr. Joseph." Mr. Joseph

said: "Yes, sir." And thereupon the books referred to were handed to the jury to be examined. As shown by the record, this constituted the fifth exception.

The sixth exception was taken to the ruling of the court in permitting the witness to testify that books were used in running a lottery, and, when asked what sort of books, he said: "Triple sheets." And when asked to describe them more fully, he said: "Well, there is a number on them and also a number given each writer, in the book. You will see it there (indicating), if you look, and there you will also see each paper in triple form and each one has that number. A serial number." "Ques.: All right? Ans.: And the name of the corporation." The court was asked to strike out the last answer, and upon refusal to do so the seventh exception was taken.

On cross-examination, the witness testified that he had no warrant to enter and search the house or to arrest Heyward.

Officer Bradley, also of the Northwestern District, testified that he was with Sergeant Hitzelberger on March 20th at 1716 Brunt Street. He went to the rear and was let in the house by a colored man. "When I got in there, Sergeant Hitzelberger was in the kitchen, where Gorman and three other colored men were seated at a table. * * * They were seated there with lottery slips in front of them. Sergeant Hitzelberger then told me to take the front door and to watch for the 'pick-up man' which I did, and when Heyward came in there we arrested him and Gorman and the rest of them, and took them to the station house, where Heyward was searched." The witness had watched Heyward prior to that day and that he went to 1716 Brunt Street. They did not see him go to any other place; after he left there they generally lost him; he had a machine. Witness was present when Hayward was searched at the station house, and some envelopes and money were taken off him, those that were offered in evidence.

The second exception, as we have said, was to the admission in evidence of the slips, envelopes with money in them,

found upon the person of Heyward when searched after arrest at the station house. The admission of the papers and envelopes in evidence depended upon the legality of his arrest.

It is a settled law that an officer has the right to arrest without a warrant for any crime committed within his view. It was his duty to do so at common law, and this is still the law. *Balto. & O. R. Co. v. Cain,* 81 Md. 100, 31 A. 801; *Roddy v. Finnegan,* 43 Md. 504; *Mitchell v. Lemon,* 34 Md. 181.

In *Roddy v. Finnegan, supra,* in which the party was charged with violating an ordinance of the City of Baltimore, Judge Stewart, speaking for the court, said:

"Finding the parties in the act of violating the ordinance, Roddy was not only justified in making the arrest and detention of the offenders for hearing, but his duty required him to do so, upon his responsibility as a police officer, without obtaining a warrant from any other quarter.

"The consequent delay in the procurement of a warrant, might have enabled the parties to make their escape—such narrow construction of his duty would be unreasonable, and is utterly unwarranted. * * * They (police officers of Baltimore City) have the power to prevent the commission of crime and to arrest and detain offenders for hearing, without warrant, * * * where the offense, whether by the common law, by statute, ordinances of the city, or police regulation, is committed within their view, it is their duty to do so. *Baltimore v. Howard,* 15 Md. 376; *Altvater v. Baltimore,* 31 Md. 462; *Mitchell v. Lemon,* 34 Md. 176."

In this case the officers making the arrest received information relative to the supposed violation of the lottery laws at 1716 Brunt Street, the home of Gorman. Upon the receipt of this information, the officer began a personal investigation. He visited the vicinity of 1716 Brunt Street on two separate and successive days; he not only saw ten to fifteen persons go into and come out of the house with papers in their hands before eleven o'clock in the morning, but he also saw on each of those occasions the defendant, who was, as he testified

without objection, "a pick-up man," drive his car to a location on Laurens Street about half a block from 1716 Brunt Street, and there stop his car and walk to the said house on Brunt Street, go in and come out, and return to his car and drive off. On the morning of the arrest, the officer went to 1716 Brunt Street; when he arrived there a man immediately ahead of him entered the house, leaving the door partially open; the officer followed behind him, and went back to the kitchen, and there saw Gorman, the occupant of the house, with three other negroes. Officer Bradley accompanied Sergeant Hitzelberger to Gorman's house, but he went to the rear door, where he was admitted by a colored man, one of those whom Hitzelberger had found in the house, and to whom he had given directions to let Bradley in. Bradley testified that upon entering the house he found Sergeant Hitzelberger in the kitchen, where Gorman and three other colored men were sitting at a table operating a lottery. He was then told by Hitzelberger to go to the front door and watch out for the "pick-up" man, Heyward. This he did, and when Heyward came in, and upon being charged with participation in the lottery business therein, he admitted his guilt and asked the officer, "to pass him up and he would never come around there any more." This was in the house where at such time a lottery was being operated, in which he admitted he was a participant. Under these circumstances it may well be said that the offense for which he was at the time arrested was committed within the view of the officer, and the arrest was lawfully made. It would, we think, be going very far to hold that under such circumstances the officer was required to obtain a warrant before making the arrest, and thereby, possibly, allow the defendant to make his escape. In our opinion the law cannot be so impotent and ineffective in its operation. The court, we think, committed no error in its ruling upon this exception.

The fourth and fifth exceptions were to the admission of the books, slips and papers, found in the car by Sergeant Hitzelberger after the arrest of Heyward. The admissibility of these books, slips and papers in evidence depended upon

the legality of their seizure without a search warrant. The General Assembly of Maryland at its January session, 1929, passed the following act, known as chapter 194, which is now section 4A of article 35 of the Code, Public General Laws of this State: "No evidence in the trial of misdemeanors shall be deemed admissible where the same shall have been procured by, through or in consequence of any illegal search or seizure or of any search and seizure prohibited by the Declaration of Rights of this State; nor shall any evidence in such cases be admissible if procured by, through or in consequence of a search and seizure, the effect of the admission of which would be to compel one to give evidence against himself in a criminal case."

Before the passage of the above act, evidence obtained or secured by virtue of an illegal search, with or without a warrant, was admitted in evidence in this state. *Lawrence v. State,* 103 Md. 17, 63 A. 96; *Meisinger v. State,* 155 Md. 195, 141 A. 536, 142 A. 190; *Richardson v. State* (Md.), 141 A. 538.

The effect of the statute is to render inadmissible, in trials of misdemeanors, evidence procured through or in consequence of any illegal search or seizure. Therefore, if in this case there was an illegal search or seizure by which the papers, slips and books found in the automobile of the defendant were procured, they were not admissible in evidence. Consequently, the inquiry must be made, Were they so procured?

The defendant, upon his arrest with the other parties who were found in the house participating in the lottery therein operated, was sent in the patrol wagon to the station house; at which time permission was given by him to Sergeant Hitzelberger to drive his car to the station. The officer, under the permission granted him by the defendant, rightfully took possession of the automobile. To drive it to the station, he, of course, was required to enter the automobile, and, when he did so, without any search therefor, he saw the slips, books and papers upon the floor of the automobile. We may well conclude therefrom that these things were not "procured by, through or in consequence of any illegal search or seizure"

within the meaning of the statute. "A search implies some exploratory investigation. It is not a search to observe that which is open and patent." *Smith v. United States,* 2 Fed. (2nd), 715, 716; *Boyd v. United States,* 286 Fed. 930.

In the sixth and seventh exceptions, the witness, Sergeant Hitzelberger, who had been engaged constantly on crimes of this character for a period of eighteen months or more, and who had covered some six hundred cases, was allowed to testify that, in running a lottery, books were used, and that the books, etc., found upon the defendant and on the floor of his car, were of a kind and character used in lottery. We discover no error in this ruling (*Nolan v. State,* 157 Md. 332, 146 A. 268); and for the reasons already stated we find no error in the court's rulings on the first exception, where the court refused, upon the petition of Hayward, to suppress or to have returned to him the evidence found in the automobile and upon the defendant's person at the time of his arrest.

After the rendition of the verdicts of the jury, by which the defendants were found guilty upon certain counts of the indictments, and after the withdrawal of the motions for a new trial, the court, before passing sentence, asked Gorman if he had anything to say about his case, to which he answered: "No, sir." The court then asked: "How long have you been operating that?" The reply was: "About three months." The court then said: "Well, swear them both." And they were both sworn.

The court then asked: "Now, Gorman, what do you want to say about your circumstances touching sentence? How long have you been operating? A. About three months." At this juncture in the proceedings, the counsel for the defendant stated: "If your Honor please, isn't that unusual?" The court: "Isn't what unusual? A. To ask the man to testify." To which the court replied: "He has not testified and this is not a trial. They are both up here now for sentence and I want to know whether they want to say anything before sentence is pronounced, whether they wish to say anything either in mitigation or explanation, either or both. If they do not want to, I advise them not to make a state-

ment. They have a perfect right to refuse to answer, but it is always customary after a trial for the defendants, if found guilty, to make such statements as they may elect to make in mitigation of sentence. It is not in violation at all of the constitutional provision which says that no man is to be compelled to convict himself, for these men have already been convicted by juries. Now, there is a maximum penalty here and I am simply giving them an opportunity to tell me whatever they may wish to tell me of the circumstances surrounding their activities, the duration and extent of them, all of which would be in mitigation of punishment, that is all. Now, if they do not wish to mitigate it in any way, or give me any information that would tend to mitigate it, they have a perfect right to refuse to make any statement. * * * I am simply trying to get information so as to be able to say to what extent it ought to be helpful to him and what extent it may be harmful to him. * * * Well, you advise with your clients."

In reply to this statement the counsel for defendant stated that he thought it better that his client should not make any statement, and asked that the answer to the court's question be stricken out. To this the court replied: "I cannot strike out the answer. That is already in."

The court then sentenced Gorman to pay a fine of $500, and to be imprisoned in the city jail for thirty days. He was about to sentence Heyward, when he was interrupted by defendant's counsel. The latter said that Heyward was found guilty of having a lottery ticket in his possession and the court replied: "He was convicted on that count by the jury, but he was also a collector for the route of lottery tickets. * * * I give him the opportunity of giving the grand jury the benefit of his information with regard to his route, if he wants to do it. He is under no obligation to do so, however. There are some sports in the business who consider it beneath the dignity of a sporting profession to sort of welsh, you might say, on their associates. * * * The sentence is a thousand dollars fine and sixty days in jail. I will give them the same opportunity that I extended them on the

day of the trial. It is still open to them. They can give the grand jury, if they desire, what information they have as to the activities of the lottery business in Baltimore, and whatever else in connection therewith with which they may be familiar, and then, if truthfully and fully and fairly given, they may wipe out their jail sentences. That is simply a repetition of what was told them on the day of the trial."

The defendant objected to the court's action in interrogating him under oath after the rendition of the verdict and at the time of imposing sentence. This was, we think, unusual and without legal justification. But if this question were one by which the judgment appealed from could be affected on review, there was no exception to bring it before us to be reviewed.

The counsel for the defendant contended both in his oral argument and in his written brief that the sentence imposed was invalid, because conditional and uncertain. The members of this court entertain different views on the question raised. A majority of the court agree with the contention, but a majority hold further that, in the absence of a motion to strike out the sentence or an exception taken to the court's action, the question is, like the last preceding one, not presented in a shape to be reviewed.

The judgment of the court will therefore be affirmed.

*Judgment affirmed, the appellant to pay costs.*

---

BOND, C. J., filed a separate opinion as follows:

That the sentence of imprisonment, with the option attached, was imposed as a means of procuring the accusation sought against others believed to have been implicated in the crime, seems to me to follow from the court's announcement of purpose, and the use actually made of this part of the sentence to accomplish that purpose. And the valid objection to the sentence, as I see it, lies in that particular use, for the purpose is an ulterior one, not within the purposes of the proceeding before the court, or those of the judicial function.

A defendant upon conviction is to have meted out to him a sentence to be served only in expiation of the crime proved, or payment of his debt to society for it. He is not then, of course, liable to sentence for possible failure to testify before the grand jury against other persons. If, when summoned before the grand jury, he should decline to testify, or should testify falsely, he would commit another punishable act, and upon conviction for that the appropriate time and situation for another sentence would have arrived, then and not before. And in so far as the court, in a trial upon the earlier charge, metes out sentence for the purpose of aiding in the detection and prosecution of other persons, it enters into the work of police and prosecution, which has been committed to other officials, and is inconsistent with the duties of the judicial office. The functions of judge and prosecutor cannot be fairly and safely united. It may be that immediate good will sometimes follow departures from the principles involved, but it will be agreed, I take it, that those principles are of such great general importance that we cannot afford to have them subjected to the subversive effect of disregard in selected cases.

I concur in the views which Judge Parke expresses in his separate opinion, except that I am not ready to agree now that a sentence may never be made conditional, for any purpose, that, for instance, a sentence of imprisonment for larceny might never be coupled with a provision for remission of part upon restitution of the goods stolen.

---

PARKE, J., filed a separate opinion as follows:

It is true that the docket entries show a certain and definite sentence within the law, but these entries are the brief notations by the clerk, who is merely the hand of the court. A docket entry is not the conclusive evidence of the court's act, and, so, may be corrected or shown to be inaccurate or incomplete in order that the record may truly conform to the facts. *Weighorst v. State,* 7 Md. 442, 449, 450; *Watkins v. State,* 14 Md. 412, 421-423; *Dutton v. State,* 123 Md. 373, 376,

91 A. 417. Here the entry by the clerk on the docket of a sentence to pay a fine of $1,000 and to be imprisoned for the term of sixty days is shown, by the certification of the court of its action, to be incomplete, and the sentence actually imposed to embrace the condition subsequent that the term of imprisonmnet would be abrogated provided the convict would go before the grand jury and reveal criminal acts of other undisclosed parties. Although there was no motion made to strike out this conditional sentence nor any exception taken to the action of the court, the sentence, it would seem, may be reviewed on this appeal from the judgment, as is illustrated by *Cochran v. State,* 119 Md. 539, 557-558, 87 A. 400; *Kelly v. State,* 151 Md. 87, 100-101, 133 A. 899; *Klein v. State,* 151 Md. 484, 493-494, 135 A. 591. See Code, art. 5, sec. 86; *Price v. State,* 159 Md. 497, 151 A. 409.

The writer of this comment inclines to the view that this tribunal should have reversed the judgment and remanded the cause for the imposition of a proper sentence by the trial court, as is authorized by section 87 of article 5 of the Code. In other respects I fully agree with the opinion of the court.

The views expressed by Chief Judge Bond are, in my judgment, wholly sound, and are supported by reasons so well stated that further discussion is unnecessary, but it may be observed that the condition imposed is open to the further objections of tending to incite the convict to bear false witness and commit perjury, and of making the sentence void for uncertainty and indefiniteness.

The statement in *Chitty* that "it is also an established rule of the English law, that the judges in the exercise of their discretion can invent no new penalties to suit the offence, or to gratify their own caprices," is sound law in this jurisdiction. 1 *Chitty on Criminal Law,* *712; 4 *Blackstone Com.,* 378; *Watkins v. State,* 14 Md. 412, 421-424; *Negro Peter v. State,* 4 H. & McH. 3; *Negro Cornish v. State,* 15 Md. 208, 210-211; *McDonald v. State,* 45 Md. 90. See Code, art. 5, sec. 87. So, a valid sentence must be certain and definite. Unless authorized by statute, it should not depend upon any contingency, nor be subject to a future decision, but must

be unconditional. 1 *Archbold's Crim. Pr. & Pl.,* p. 580; 1 *Chitty on Crim. Law,* \*701; 1 *Bishop on Crim. Prac.,* sec. 1309; 19 *Am. & Eng. Ency. of Pl. & Pr.,* 475.

The sentence at bar imposed both fine and imprisonment. The service of the term in jail depended, however, not only upon the convict's election to comply with the condition, but also, and, ultimately, upon the court's determination that the convict had fulfilled the condition of appearing before the grand jury and giving the required testimony. The sentence was, therefore, uncertain and indefinite because of an inseparable condition of a coercive nature. The authorities denounce such a sentence. *Rex v. Collier and Cape,* 1 Wils. 332, 95 Eng. Rep. 647; *State v. Bennett,* 20 N. C. (4 Dev. & B. Law) 43; *Ex parte United States,* 242 U. S. 27, 45, 37 S. Ct. 72, 61 L. Ed. 129, 142; *Wallace v. State,* 126 Ga. 749, 55 S. E. 1042; *State v. Sturgis,* 110 Me. 96, 99, 85 A. 474; *Miller v. Camden,* 63 N. J. Law, 501, 504, 43 A. 1069, 1070.

Under the condition imposed, the failure of the convict satisfactorily to testify before the grand jury is what the court punishes by the sixty days' term of imprisonment. The court, in effect, originates a new offense unknown to the law, and prescribes its punishment.