## HARRY BASS ET AL. *v.* STATE OF MARYLAND
### [No. 54, October Term, 1943]

*Decided December 15, 1943.*

The cause was argued before SLOAN, C. J., DELAPLAINE, COLLINS, MARBURY, MELVIN, ADAMS, and BAILEY, JJ.

*Ellis Levin* and *A. David Gomborov* for the appellants.

*J. Edgar Harvey, Assistant Attorney General,* with whom were *William C. Walsh, Attorney General, J. Bernard Wells, State's Attorney for Baltimore City,* and *Anselm Sodaro, Assistant State's Attorney for Baltimore City,* on the brief, for the appellee.

MELVIN, J., delivered the opinion of the Court.

The appellants were indicted and convicted for violating the law against the showing of obscene motion pictures. It was conceded that the particular picture in question was obscene and uncensored, and that the ap-

498

pellants directly participated in the exhibition of it. The only issue in the case is the technical one of the manner in which the evidence was obtained, it being contended that this was contrary to the "search and seizure" provisions of the statute and of the organic law. The indictment contains eleven counts, which include conspiracy "to unlawfully show, exhibit and expose certain lewd, obscene and indecent pictures and photographs, the said picture and photographs being too obscene to be spread on the records of this Court."

Each of the seven defendants (appellants) pleaded not guilty and submitted his case for trial before the court without a jury. The verdict was "guilty," generally, under the indictment as to each defendant and all have joined in this appeal.

The record shows that the appellants are members and officers of the "Louis D. Brandeis Lodge of the Knights of Pythias," which is the Baltimore branch of that organization in Maryland, and which, on the evening of June 17, 1943, held a prearranged stag party for members and prospective members at the Pythian Building. The Police Department having been forewarned as to this party and as to the alleged obscene nature of the exhibition to be given, a "strip tease" performance, sent four of its officers to the designated premises, which were located on the fourth floor of the lodge building, corner Charles and Preston Streets. At the first door on which they rapped, they were told that there was a private meeting going on and that they could not enter. The officers then walked across to the opposite side of the building where one of them, Lieutenant Emerson, rang the bell at a door which was opened to them by the appellant, Raskin. It is at this point that the conflict in the testimony presents the issue of fact upon which the decision of the case largely depends.

According to the State's witnesses, Lieutenant Emerson, Sergeant Stone and Officer Harla, the entrance of the four officers from the hall to the anteroom was

without protest or hindrance and was through a door that had been opened "wide" by Raskin. The latter testified that, on the contrary, in answer to the bell he went to the door, although he was not the doorkeeper, "and opened it slightly, and before he had a chance to ask who it was, or find out the pass word, Lieutenant Emerson, followed by Sergeant Stone and the other two officers, pushed the door in and pinned him against the wall."

This is directly denied by the officers, themselves, and Raskin is the only defense witness on this point, although there were several other persons in the room at the time the officers entered it, including two women. One of the persons, in particular, Joseph J. Mund, although called as a defense witness, was not even asked as to the manner of the officers' entrance and gave no testimony regarding it. They all remained in this anteroom for several minutes. Besides the two women above mentioned, there were three others in an adjoining dressing room, all five of whom were said to have been strip tease dancers.

While standing in this outer room both Lieutenant Emerson and Sergeant Stone heard remarks coming from the adjacent lodge room which they interpreted (and correctly, it later developed) as indicating the commission of a criminal offense involving obscenity and lewdness. They, thereupon, turned the knob of the unlocked and unattended door leading into the lodge room, and entered there. These two officers stood in the lodge room for seven or eight minutes, witnessed the exhibition of the admittedly obscene and uncensored pictures, established the identity of the persons responsible for holding the exhibition, and later seized the pictures themselves and caused the arrest of seven officers of the lodge, the defendants (appellants).

At the trial the whole defense of the case was based on the alleged violation by the police officers of the search and seizure provisions of the law, that is to say, of Section 5, Article 35 of Flack's Code of 1939, and

Articles 22 and 26 of the Maryland Bill of Rights. It was contended below, and also on this appeal, that the evidence upon which the defendants were convicted was procured as the result of "an illegal entry, search and seizure." There were two exceptions taken—one to the trial court's overruling of defendants' motion to strike from the evidence the motion pictures in question, for the reason just stated, and the other, to the overruling of the motion to strike from the evidence the testimony of the officers as to what they heard emanating from the lodge room proper after they had entered the anteroom.

The appellants having invoked in their behalf the particular laws above mentioned, and having rested their defense entirely upon them, it is of first importance to determine whether or not they are applicable to a state of facts such as shown by the record in this case. This necessitates a brief review of the history of these laws showing their original and underlying purpose and scope, so that the increasing danger of misinterpreting the doctrine against illegal searches and seizures, as applied to present-day conditions, may be avoided.

Articles 22 and 26 of the Maryland Declaration of Rights are in *pari materia* with the Fourth and Fifth Amendments to the Constitution of the United States (*Blum v. State*, 94 Md. 375, 51 A. 26, 56 L. R. A. 322), and the immunities thereby guaranteed are fairly summed up in Article 35, Section 5 of the Maryland Code. This provides that "No evidence in the trial of misdemeanors shall be deemed admissible where the same shall have been procured by, through, or in consequence of, any illegal search or seizure or of any search and seizure prohibited by the Declaration of Rights of this State; nor shall any evidence in such cases be admissible if procured by, through, or in consequence of, a search and seizure, the effect of the admission of which would be to compel one to give evidence against himself in a criminal case."

The background of this statute is the ancient common law, which culminated in a ruling against a previously recognized right of executive agents to enter a person's home and search it, and seize his private papers, in order to obtain evidence of political offenses. This common law rule, as revised, became formally established in England and was the law there when the government of the United States was formed. The reason for it is thus expressed in *Cornelius on Search and Seizure*, 2nd Ed., par. 3, page 12: "English history discloses as the original occasion for constitutional provisions on the subject that they had their origin 'in the abuses of executive authority, and in the unwarrantable intrusion of executive agents into the houses and among the private papers of individuals, in order to obtain evidence of political offenses.' *Cooley's Constitutional Limitations*, 300."

When the Constitution of the United States was adopted and ratified this principle of common law was omitted, but it became expressly embodied in the Fourth and Fifth Amendments in the form of a declaration of rights safeguarding, especially, the immunities therein expressed. Thus the common law rule became reaffirmed in our Federal Constitution and guaranteed to the people of the United States the right of security in their persons, houses, papers and effects, against unreasonable searches and seizures at the hands of Federal officers.

Thereafter every State, as a part of its own constitution or declaration of rights, properly adopted similar provisions, so that from the foundation of our government all citizens are thus doubly protected against unreasonable searches and seizures. As expressed in *Cooley's Constitutional Limitations*, p. 425, "The maxim that 'every man's house is his castle' is made a part of our constitutional law in the clause prohibiting unreasonable searches and seizures, and has always been looked to as of high value to the citizens." In more picturesque language, the principle is expressed by

Chatham in his *Speeches on General Warrants*, as follows: "The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail, its roof may sag, the wind may blow through it, the storm may enter, the rain may enter but the King of England may not enter. All his force dares not cross the threshold of the ruined tenement." (Quoted in *Cornelius on Search and Seizure*, 2nd Ed., par. 3, p. 13.)

Ever since the early days of this doctrine, down to the present time, the rights secured by these constitutional provisions, both Federal and State, have been regarded by the courts as very precious ones to be safeguarded by them with all the power and authority at their command. *Gouled v. United States*, 255 U. S. 298, 65 L. Ed. 647; *Gorman v. State*, 161 Md. 700, 158 A. 903; *Miller v. State*, 174 Md. 362, 198 A. 710; *United States v. Sam Chin*, 24 F. Supp. 14.

However, it is to be noted and emphasized here that the guaranteed immunities had to do exclusively with those cases, and those cases only, where there had been an actual search and where there had been an intrusion by executive agents or police into private homes or possessions of individuals. Both the spirit and the objective of the legislation was in line with the old maxim that "every man's house is his castle," and this was the principle which seems to have characterized the court's decisions in all the cases in which the doctrine has been invoked. That the immunities do not extend to any case where there was no search has been settled by the authorities, for "a search implies some exploratory investigation. It is not a search to observe that which is open and patent." *Heyward v. State*, 161 Md. 685, 695, 158 A. 897, 900; *Smith v. United States*, 2 F. 2d 715; *Boyd v. United States*, 286 F. 930.

From the above mentioned provisions of the organic law, a question of evidence naturally arose which caused sharp division among the courts. This question was: May evidence obtained from a defendant by an illegal search and seizure be used to convict him? The United

States Supreme Court early took the stand that evidence thus obtained would not be admitted. *Boyd v. United States,* 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746; *Weeks v. United States,* 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652. Thereafter all of the subordinate Federal courts and most of the States, one after another, adopted this doctrine.

In Maryland, this step was taken in 1929 by the enactment of Chapter 194 of the Acts of the General Assembly of Maryland of that year, now codified as Section 5, Article 35 of the Code of Public General Laws, and hereinbefore quoted. Before the passage of that Act, evidence obtained by virtue of an illegal search, with or without a warrant, was admitted in evidence in this State. *Lawrence v. State,* 103 Md. 17, 63 A. 96; *Heyward v. State, supra; Hitzelberger v. State,* 174 Md. 152, 165, 197 A. 605.

While the effect of this statute is to render inadmissible in trials of misdemeanors, evidence procured by, through or in consequence of any illegal search or seizure, it did not change or affect in any way the original purpose or essential characteristics of the law as it formerly stood. That is to say, the Fourth and Fifth Amendments to the Federal Constitution, and Articles 22 and 26 of the Maryland Declaration of Rights, are fundamentally unchanged and their application has not been enlarged or extended so as to include any different classes of cases than those originally intended. In order to render the doctrine prohibiting unreasonable searches applicable, there still must be a search and there still must be a trespass upon the privacy of one's home or possessions within the meaning of the law, as originally conceived.

The steady drift of the States toward the exclusion doctrine as to evidence obtained by an illegal search and seizure was obviously accelerated by the adoption of the Eighteenth Amendment to the Federal Constitution and the enactment thereunder of the National Prohibition Act, 27 U. S. C. A., Sec. 1 et seq., and State legisla-

tion relating thereto. The vast majority of the cases in recent years throughout the United States, involving search and seizure, have been in connection with the attempted enforcement of liquor laws, and these, together with violations of the laws against lotteries, narcotics, etc., caused the widespread and increasing resort to searches and seizures by the police. The danger of impingement upon the constitutional guarantees against these illegal methods became greatly increased and called for extra vigilance by the courts to uphold them. That our own court so regarded the situation is shown by the careful treatment given the subject in all the cases relating to it. Among these, for example, are: *Blum v. State,* 94 Md. 383, 384, 51 A. 26; *Gorman v. State, supra; Heyward v. State, supra; Miller v. State,* 174 Md. 362, 363, 198 A. 710; *Blager v. State,* 162, Md. 664, 161 A. 1; *Wright v. State,* 177 Md. 230, 234, 9 A. 2d 253.

The cases above cited show how far the pendulum has swung in the direction of excluding evidence obtained through illegal searches and seizures, and how zealously the courts have protected the constiutional guarantees against invasion of a person's privacy of home and possessions. However, we deem it to be of no less importance that the inherent purpose of this legislation be not violated by unduly enlarging its scope and giving the relevant clauses an interpretation that was never intended. This point calls for special emphasis now-a-days.

The case at bar presents a state of facts which clearly shows the line of distinction between these two classifications. Here, there was no invasion of the privacy of an individual's home or possessions, nor was there any search made or attempted by the police officers. The tenant of the premises upon which they entered was a fraternal order or lodge, of which the defendants were members and officers. The building where the lodge quarters were housed is one of at least four stories on a prominent street corner in Baltimore City. In response to notices sent to all of its members and pros-

pective members, some seventy-five persons gathered in these premises, consisting of several rooms and a hall on the fourth floor of the building, for the holding of a stag party.

The advance notice of this party—a poster of which fell into the hands of the police—showed that it was to be featured by a "strip tease" performance, and four officers were detailed to visit the premises that evening, and they went there in their line of duty. Admission was gained by ringing a bell at one of the hall doors which was opened for them by an officer of the lodge (Raskin). They entered an anteroom where they stood for several minutes without protest from any source, and in the presence of other persons who were also non-lodge members. Something was obviously "going on" in the room immediately adjoining—the lodge room—and the persons in the anteroom were awaiting developments from that quarter, much in the manner of persons who might have been admitted to the vestibule of a private home by a servant or inmate thereof, and stood there waiting to be admitted farther or dismissed.

The presence of the officers in this anteroom violated no law and was no invasion of any person's constitutional rights or immunities. Moreover, they were fully justified in the next step they took, which was to walk into the lodge room after they heard coming therefrom the remarks quoted in the record, and which were susceptible of no other interpretation than that of indicating the commission of a criminal offense involving obscenity and lewdness. That was the very kind of offence of which the officers had been forewarned, a "strip tease," and when their sense of hearing apprised them of an unlawful act in progress, their entry into the lodge room, under the circumstances, was legal. This was on the theory that the unlawful act was committed in their "presence," for it is settled in Maryland that an offense is considered as taking place within the "presence" or "view" of an officer when his senses afford

him knowledge that one is being committed. In such a situation the presence of the officer is rightful and he may arrest the offenders without a warrant. *Silverstein v. State,* 176 Md. 533, 6 A. 2d 465; *Gorman v. State,* 161 Md. 700, 705, 158 A. 903; *McBride v. United States,* 284 F. 416; 4 *American Jurisprudence, Arrest,* p. 22, Sec. 29; *Hochheimer's Criminal Law,* 2d Ed., Sec. 67; *Heyward v. State, supra.*

The officers therefore not only had a right to enter the lodge room, but it became their duty to do so, under the circumstances. Their presence in that room was not for the purpose of search and seizure, and the law applicable to that doctrine is not controlling here. Their entry was due to the necessities of the case and was for the particular purpose of arresting violators of the law who had committed an offense in their view or presence, as legally defined. Therefore, being rightfully in the lodge room, what they saw and heard there was not due to any search or attempted search. The officers became eyewitnesses to a flagrant violation of the law, and they had a perfect right, and duty, to arrest the offenders and to seize the unlawful films. If a misdemeanor be committed in the presence of an officer who is charged with the enforcement of the law, he is authorized, without warrant, to arrest the offender and then, as an incident of the arrest, to seize the immediate evidence of the crime. *Callahan v. State,* 163 Md. 298, 301, 162 A. 856; *Heyward v. State,* 161 Md. 685, 158 A. 897; *Blager v. State,* 162 Md. 664, 161 A. 1; *Lawrence v. State,* 103 Md. 17, 63 A. 96.

The appellants rely largely upon the case of *Gorman v. State, supra.* While that case goes as least as far as any other in Maryland in applying the search and seizure statute in behalf of a defendant, it serves, at the same time, to emphasize the distinction to be drawn between cases of that class and the class to which the case at bar belongs. The defendant in the Gorman case was in his own home or dwelling house, seated at a table in his kitchen, when the police officer pushed open a door

which was ajar and "walked in." While there were lottery slips, envelopes and money lying upon the table, which the officer seized, the Appellate Court held that there had been an illegal "search and seizure" and that, therefore, the evidence thus obtained could not be used against the defendant.

The basis of the decision in that case and the essence of the offense, as stated by the court, was that there had been an "invasion of the privacy of defendant's home." This controlling factor was further emphasized in the opinion by references to the "sanctity of a man's home and the privacies of life" (24 R. C. L. 717); to the principle that the search of a private dwelling without a warrant is in itself unreasonable and abhorent to our laws (*Agnello v. United States*, 269 U. S. 20, 70 L. Ed. 145), and further to the maxim that "every man's house is his castle."

In the case at bar an entirely different kind of picture is presented. There is no such thing involved here as the invasion of the sanctity of a man's home or the search of a private dwelling or possessions. In fact, there was neither an invasion nor a search of any one's premises, as hereinbefore pointed out. On the contrary, there was a quasi-public gathering of some seventy-five persons who had been called together to participate in a brazen offense against the law. It was the kind of a performance which is totally foreign to the sanctity of a home, such as the search and seizure laws were designed to protect. The defendants, as officers of the organization upon whose premises the offense took place and who deliberately and actively took part in staging it, are in no position to invoke the constitutional immunities in question. For the court to allow them to do so by putting any such interpretation upon this time-honored doctrine would amount to a farce and a flaw in our system of jurisprudence which would be a confession of impotency in upholding the peace, government and dignity of the State.

As we construe this doctrine, it was never intended to be used as a shield to protect groups of persons who, masquerading under the name and form of a lodge or club, or other organization, flout both the moral and the statute law, menace the decency of the community and disgrace their own good name, and then have the effrontery to invoke the majesty and dignity of the law in their behalf.

The trial court, we hold, committed no error in the rulings to which the exceptions were taken, and the judgment rendered as to each defendant will, therefore, be affirmed.

*Judgment affirmed, the appellants to pay costs.*