# LE FAIVRE *v.* STATE

[No. 178, October Term, 1954]

54

*Decided July 27, 1955.*

*Motion for rehearing filed August 22, 1955, granted October 4, 1955.*

*Per curiam filed December 5, 1955.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Alan H. Murrell,* for appellant.

*David Kauffman,* Assistant Attorney General, with whom were *C. Ferdinand Sybert,* Attorney General, *Anselm Sodaro,* State's Attorney for Baltimore City, and *Edwin A. Gehring,* Assistant State's Attorney.

BRUNE, C. J., delivered the opinion of the Court.

The appellant was tried and convicted on lottery and bookmaking charges and was sentenced to fines aggregat-

ing $1100, and costs, and imprisonment for a year.  He appeals.  The principal question at issue is the validity of his arrest, since the legality of the search of his person which produced the evidence upon which he was convicted depends upon the legality of his arrest.

On January 9, 1954, shortly before 8:30 P.M., Detectives Kemple and Morsberger of the Baltimore City Police Department went to the appellant's place of business in Baltimore to "pick him up" for investigation on account of a burglary which had occurred on January 4th. They had no warrant for his arrest.  The police officers entered the premises and went to the door of the traverser's office.  The door was open a little way, and Sergeant Kemple testified that he saw the traverser sitting at a desk and working on some papers, the nature of which the Sergeant did not then know.  Kemple called to the traverser, who recognized him; and in reply to Kemple's statement that he wanted to see him a minute, the traverser said "Come on in."  Kemple and Morsberger then entered the office with Kemple in the lead. Kemple further testified that as he walked up alongside the desk, he noticed some papers on it and that he "noticed the name 'Tip-off', then a dash and 2 dash DD" and that from his experience as a former member of the Vice Squad he knew that this notation "was part of a daily double horse racing bet." When the traverser saw the police officer looking at these papers he picked them up and put them in his pocket.  The second officer testified that he was not able to see what was written on the papers which the traverser put in his pocket.  While there are some minor differences in the testimony of the two officers, we find no serious discrepancy.  The principal difference is that the officer, who entered behind the sergeant, naturally could not see so much.

The two police officers took the appellant to a police station where he was booked on the arrest register as "Held for investigation.  Charge, Burglary."  There was no notation at that time of any other charge.  The appel-

lant was then searched and numerous papers containing notations of race horse bets and lottery numbers were found on his person and were seized by the police. In some wholly unexplained manner this documentary evidence disappeared, and none of it was produced at the trial, though several officers testified to the nature of the papers.

The rule is well established that if a misdemeanor is being committed in the presence or view of a police officer he may forthwith arrest the offender without a warrant, and that an offense is committed in his presence or view if, through his senses, he has knowledge of facts or circumstances sufficient to justify a sincere belief that the accused is committing the misdemeanor in his presence. *Griffin v. State,* 200 Md. 569, 92 A. 2d 743; *Kershaw v. State,* 199 Md. 135, 85 A. 2d 783; *Bass v. State,* 182 Md. 496, 35 A. 2d 155. If the arrest was lawful, the search and seizure at the police station was proper. *Robinson v. State,* 200 Md. 128, 88 A. 2d 310. Evidence obtained as a result of a search and seizure incident to a lawful arrest is admissible. *Kershaw v. State, supra; Robinson v. State, supra; Callahan v. State,* 163 Md. 298, 162 A. 856. On the other hand, if no misdemeanor was committed in the presence of the officer, the arrest would be unlawful, a search based upon such an arrest would be unlawful and evidence thereby discovered in the possession of the accused would be inadmissible. *Walker v. State,* 195 Md. 412, 73 A. 2d 508. There is no dispute as to the law, and further citation of authority would be only cumulative.

There is, however, a serious dispute as to the essential fact upon which the legality of the arrest depends. That is whether or not a misdemeanor was being committed in the presence of the arresting officers, or either of them, at the time when the traverser was taken into custody at his place of business. The traverser duly objected to the admission of evidence later obtained at the police station through the search of his person on the ground

that the arrest and hence the search were illegal. His objections were overruled and the evidence was admitted. The chief question before us is whether or not the trial court was in error on this ruling; and since the ruling was based upon a question of fact, the ultimate question with which we are confronted is whether or not this finding of fact was clearly erroneous.

The evidence that there were some papers on the appellant's desk is clear. The testimony of Sergeant Kemple to the effect that as he came to the door of the appellant's office and looked in he saw the appellant working on some papers and either writing, starting to write or just finishing writing something is also clear. So is his testimony with regard to the notation which he says that he saw written on one of the papers. He based his interpretation of the meaning of this notation on his expert knowledge of bookmaking operations acquired during his service as a member of the Vice Squad, and his qualifications as an expert were admitted. Such expert knowledge may be relied upon by him in viewing circumstances before him to decide whether the law is being violated in his presence. *Griffin v. State, supra; Walker v. State, supra.*

Code (1951), Article 27, Section 306, provides, among other things, that it is an offense "to receive, become the depository of, *record or register* * * * *any* money, bet *wager,* [or] thing or consideration of value, to be bet, gambled or wagered in any manner * * * upon the result of any race, contest or contingency * * *." (Emphasis supplied.) What Sergeant Kemple testified that he saw the defendant doing and what he testified that he saw written on the paper in front of the appellant, considered in the light of his expert knowledge of its meaning, were sufficient, if true, to show a violation of the italicized provisions of Section 306 and hence to make the arrest lawful. In this view of the matter, the fact that the mere possession of a notation of a bet, unlike the mere possession of a lottery slip, does not constitute an offense, is unimportant.

Thus the ultimate question is one of the credibility of a witness. The learned and experienced trial judge saw the witness and heard him testify and stated that he did not regard his testimony as "unbelievable." Evidently, the trial judge accepted it as true, and on the basis of that testimony he held the arrest legal. The absence of any charge of violating the gambling laws when the appellant was taken into custody and when he was booked at the police station certainly lends force to the appellant's contention that the officers did not observe any misdemeanor being committed in their presence when they were at the appellant's office. However, even though we, with only the printed record before us, might possibly arrive at a different conclusion from that of the trial judge, yet in view of his opportunity to see and hear the witness and to appraise his truthfulness, we cannot say that he was clearly erroneous in reaching the conclusion that a misdemeanor was committed in the presence of the officer.

The appellant also urges that it was error on the part of the trial court to exclude evidence which the appellant sought to offer to show that the arresting officers had no reasonable cause to suspect that he had committed the burglary which they were investigating. Since the State abandoned any attempt to uphold the arrest on the ground that they had reasonable cause to suspect or believe the defendant guilty of a felony, this testimony was properly excluded as irrelevant to the only issue remaining in the case with regard to the validity of the arrest of the appellant.

In accordance with the views above expressed, the judgment is affirmed.

*Judgment affirmed, with costs.*

HAMMOND, J., filed the following dissenting opinion:

Mr. Justice Holmes, with his usual clarity of perception, said that "Consciously or unconsciously we all strive

to make the kind of world we like". It is not surprising then that policemen, who have discovered on the person of a prisoner evidence which will convict him of breaking a law they have long suspected that he was breaking, will strive for the kind of world in which that evidence will not be excluded at the trial because the arrest which put the prisoner in custody was unlawful. On the other hand, a court helps to make the kind of world it likes when it protects the right of the individual not to be unlawfully arrested, even though by its so doing, a law violator goes free. If a court takes an elastic view of the facts and the law in upholding the conviction of one clearly guilty, it hurts the community by furnishing the police the ammunition of bad law and psychological encouragement which will later hurt the innocent. "So a search against Brinegar's car must be regarded as a search of the car of Everyman." *Brinegar v. United States*, 338 U. S. 160, 93 L. Ed. 1879 (Mr. Justice Jackson dissenting).

As I read the record, the findings of the trial judge on the facts and as to the law, which this Court approved, were clearly erroneous, and the arrest illegal.

The testimony of the sergeant, relied on by the State to show that a misdemeanor was committed in his presence, falls of its own inconsistencies and inherent improbabilities. Beyond this, the testimony of others of the police force, called by the State, leaves no doubt in my mind that the sergeant's recollection of what he saw is in error and that no misdemeanor was committed in his presence. Added strength is given to the testimony of the others because the witnesses were sequestered during the trial. The background of this conclusion is this: The appellant was arrested at his place of business, the office of a pinball machine company in East Baltimore, which is a one-story building approximately eighteen by thirty-five feet. A store front window takes up all of the front except that occupied by the door, which is also of glass. Contrary to the assumption relied on by the ma-

jority opinion, the premises consist of only one room and the police did not enter the building and then proceed to a separate office. As the police sergeant and the detective approached the building, they saw the appellant seated at his desk at the rear of the room—thirty feet from the door. As he sat behind the desk, he was facing the door so that the officers looked at him and he looked at them, as they approached the door and entered. He was wearing an overcoat and, according to the testimony of the sergeant, the front door was partially open on this January night. Another man was standing at the left of the desk in conversation with appellant. There were papers on the desk, having to do with the pinball business and, according to the sergeant, other papers directly in front of the appellant. The sergeant entered a foot or two ahead of the detective. The latter says that when he was seven or eight feet from the desk, and the sergeant was three or four feet from the desk, the appellant stood up and put the papers which had been directly in front of him in his pocket. The sergeant says that it was not until he got alongside of the desk and saw written on one of the slips of paper the words "Tip-off— 2-dd", which he recognized as a daily double bet, did the appellant put the papers in his pocket. The majority opinion says that because the sergeant testified that he saw the appellant "either writing, starting to write, or just finishing writing", that what he saw on the piece of paper and what he saw the appellant doing was enough to show that appellant was recording or registering a bet and so was committing a misdemeanor in the presence of the officers, which made his arrest legal and the evidence found on him admissible. It is to be noted that in his original description of what occurred, the sergeant said nothing whatever of seeing the appellant have a pencil or write. Before any mention was made of this, the sergeant's testimony had covered twenty-six pages of the transcript. It was first mentioned when the sergeant was telling of adding up the bet slips in the police station,

hours after the arrest, and appellant objected to including notations on a summary sheet as additional bets, when they were merely summaries of the bets on the small slips of paper. The sergeant then testified: "In other words he was copying the bets off of these small scraps of paper onto a master sheet for himself when I came into the office. At least, *that is what I assumed he was doing.*" The court then asked the sergeant whether he saw the appellant writing and the answer was that quoted above—that he couldn't recall whether appellant was writing, in the course of starting to write, or had just finished writing. On cross-examination, when the sergeant was asked whether the appellant had a pencil in his hand, his answer was: "I believe he did." His colleague, the detective, said nothing whatever in his testimony about the appellant writing; when the prosecutor asked him the leading question as to whether appellant had a pencil in his hand, his answer was "I do not remember". The testimony of both police officers is that the sergeant told the appellant he was wanted downtown for questioning and would learn why when he got there, that they did not search the place or the appellant and that they did not concern themselves with the second man. What happened to him is not told, but he was not taken into custody, questioned or searched.

The appellant was taken immediately to the Central Police Station and booked on suspicion of burglary. No notation whatever was made as to lottery or bookmaking. He was then searched in the presence of Capt. Kenealy and the sergeant and detective who had arrested him. Capt. Kenealy says that appellant came in just as he was leaving for the night and he came back to the booking desk. When asked what happened when the appellant was searched by the turnkey, he said that various articles were taken from his pockets, such as his wallet and keys, and were laid on a board across the top of the booking desk where the railing is. The captain continued: "As the articles were laid up there I watched

the turnkey, and in amongst the articles was, I would call, a manila or buff-colored envelope. It was a small envelope, I would say about maybe 3 inches long by 1½ inches, maybe 2 inches, wide. * * * When he laid that down I picked it up. It was unsealed, and I opened it, and in it were some slips of paper, small slips of paper such as taken from a scratch pad," which the captain recognized as race horse bets. When asked what he did, the captain said: "I first turned to Sergeant Kemple and showed him what I had, and then I turned to Mr. Funk and I showed it to him. * * * I turned around then and put it back in the envelope and handed it back to Sergeant Kemple. I said 'That is yours. You know what to do with it.' And he said 'Yes, Sir'."

Among the many reasons that lead me to believe that the police saw no misdemeanor committed in their presence are these:

1—The setting of the arrest scene was hardly one to suggest that bookmaking was being engaged in. The time was eight-thirty on a January night, and the races of that day had been over three or four hours and the races of the following day were seventeen or eighteen hours off. The place was a business establishment and the leading man in the drama was sitting at a desk with his overcoat on in full view of all outside who might pass the store front window and the open glass front door.

2—It is incredible that an experienced bookmaker (and the appellant was described by the police as known before the arrest to be a "big bookmaker"), after inviting the police in, would wait to put incriminating evidence in his pocket until the police arrived at his desk and looked at the evidence, when he had the opportunity to do so while they were crossing a space of thirty feet.

3—It is difficult to see how the sergeant read the writing on a slip of paper in front of the man facing him across the desk; in other words, how he could read the writing upside down.

4—It takes two horses to make up a daily double bet— one in the first race and one in the second. All that the sergeant says that he saw on the slip was "Tip-off—2-dd". He says that it was discovered later that the bet was Tip-off in the first race and Flying Weather in the second race at Tropical Park the afternoon of the day of the arrest. In the particulars given the appellant by the State, the slip the sergeant says he saw is described as having on it the following:

Tip-off

Flying Weather 2-dd

The notation "2-dd" was opposite the name Flying Weather and not opposite the name Tip-off.

5—The sergeant testified that he recognized the slip of paper as a race horse bet because of his long experience on the vice squad. It is not to be accepted that an experienced vice squad officer, after making an arrest, would forego not only his right but his duty to search the arrestee and the premises. It is not to be believed the officers would even let the suspect put the evidence in his pocket. Yet, the officers admit that they did not prevent this nor search appellant or the room. Significantly, after they had found the betting slips at the police station, they returned and searched the premises thoroughly.

6—If the appellant was engaged in bookmaking in the presence of the police, he was doing so in company with the unidentified man who was talking to him at the desk. Yet the officers addressed no inquiries to this individual, did not search him nor arrest him.

7—If the officers had arrested appellant for a misdemeanor committed in their presence, certainly they would have booked him at the police station on the charge for which they arrested him, even if it were one of two charges. Instead, they booked him only on the suspicion of burglary, which is what they went to pick him up for and, in my opinion, all they did pick him up for.

8—Both the sergeant and the detective said that the appellant picked up various small pieces of paper and put *them* in his pocket. For example, the detective says that it took appellant two or three seconds to gather them together. His testimony was this: "They weren't exactly all in one pile. He had to pick them up in sort of groups. * * * I did see him put *them* in a pocket." Captain Kenealy's testimony is that there was taken from the pocket of the appellant when he was searched at the police station, a buff manila envelope, which contained all of the betting slips. Neither of the officers made any mention of the papers being put in an envelope or that they saw any envelope. Rather, they said the papers were put loose in a pocket. Obviously, when he was in custody, riding downtown with the police, he had no opportunity to transfer the papers to an envelope.

9—The sergeant's choice of language in his testimony indicates that evidence of gambling operations was first discovered at the police station. He says, for example: "We took him to the Central Police Station, where he was booked for investigation [of burglary, it may be noted]. Upon being searched by the turnkey * * * the lottery slips, plus the horse racing bets, were found on his person." He says later: "When we first searched Mr. Funk and this property *was found on him*", he obtained the manila envelope and put the evidence in it. He says again: "When the bets *were found on Mr. Funk*, Capt. Kenealy was immediately to his left. Capt. Kenealy picked the bets up and looked through them." One does not think of, or describe, as being "found" on an individual, papers which he saw that individual, who has since been in his custody, put in his pocket a few minutes before.

10—Highly significant is it that not only did the sergeant speak of finding the bet slips at the police station, but that Capt. Kenealy first spotted the betting slips and showed them to the sergeant as a great discovery. If the appellant had been brought in for violation of the

gambling laws, surely the sergeant would have so told the captain and neither would have been so happily surprised at the finding of the evidence, as apparently they were.

So much for the facts. Turning to the law of the case, if we accept the sergeant's version of what occurred as legal tender at par, still no crime was committed in his presence. It is conceded that there was no reasonable ground to believe that appellant had committed a felony, so unless a misdemeanor was committed in the presence of the sergeant and the arrest was legal, the evidence which led to the conviction of appellant was inadmissible. Code, 1951, Art. 35, Sec. 5. *Walker v. State,* 195 Md. 412.

The sergeant says that he saw in possession of the appellant what he recognized as a bet slip on a horse race. The sergeant does not even suggest that the appellant wrote the paper in his presence. Clearly, that had been done before, either by appellant or by someone else. The recording or registering of that bet was long over since the race it referred to had been run that afternoon. It is to be noted that the statute proscribes the recording or registering of "any money, bet, wager, thing or consideration of value, *to be* bet, gambled or wagered * * * upon a result of any race, contest or contingency." (Emphasis supplied.) The sergeant believes—that was his word—that the appellant had a pencil in his hand. He could not—and did not—say whether the appellant had started to write or had finished writing. His testimony was that when he came into the office, he assumed appellant was copying bets off of small slips of paper onto a master sheet, for his own purposes. The court struck out the assumptions and all that remained was that the appellant might have been holding a pencil and might have been writing something, but if he were, it definitely was not the slip the sergeant saw. Leaving aside the fact that the recording or registering forbidden is that of a wager *to be bet* on a race, this is a far cry from the facts in the cases relied on by the majority

opinion to sustain the accepted rule that an arrest may be made for a misdemeanor committed in the presence of a police officer. In *Kershaw v. State,* 199 Md. 135, the police were admitted freely to a house and in a middle room saw a scratch sheet, a Racing Form, as well as a telephone and pads of horse race bets on a nearby table. The accused said to the officers that all of these articles were his and that he had been "making book" on the premises for two weeks. After these admissions, he was arrested. In *Bass v. State,* 182 Md. 496, the officers watched the showing of an obscene movie for seven or eight minutes before making the arrest. In *Griffin v. State,* 200 Md. 569, the officers, peering through a window, saw the accused in possession of unmistakable conventional lottery tickets. Mere possession of lottery tickets is a misdemeanor. Code, 1951, Art. 27, Sec 429; *Ford v. State,* 85 Md. 465. It is not a crime merely to possess the notation of a horse race bet, as the majority opinion recognizes. In the *Griffin* case, the Court said: "Of course, a mere suspicion of an officer that the accused person is committing a misdemeanor in his presence is no justification for an arrest without a warrant. * * * The criterion is whether the circumstances, presented to the officer through his senses, were sufficient to justify a sincere belief *that the accused was committing a misdemeanor in his presence."* (Emp. sup.) There was a motion for rehearing in which it was urged that the quoted sentence broadened the right of arrest from arrest for a misdemeanor committed in an officer's presence to an arrest for a misdemeanor which the officer had probable cause to believe was committed. At page 577 of 200 Md., the Court answered the motion and contention, saying: "This was not the purpose and is not the effect of the sentence complained of. We did not broaden the right to arrest without a warrant, but merely undertook to explain, in the circumstances of the instant case, the evidence sufficient to show that a misdemeanor had been committed in the officer's presence. * * * To this

extent we did not subtract from, but added to, the legal requisites of an arrest without a warrant." This makes it plain that an officer without a warrant can make a legal arrest only for a misdemeanor which is actually committed in his presence. Under this test, the facts here fall far short of justifying the arrest. See *Walker v. State,* 195 Md. 412; *Turner v. State,* 195 Md. 289; *Frantom v. State,* 195 Md. 163; and *Gorman v. State,* 161 Md. 700.

When the sergeant entered the appellant's office, he may well have had a sincere belief—justified, and shared by many of his colleagues—that appellant was a bookmaker, that he had previously committed that misdemeanor, and probably would in the future. Yet that belief, no matter how sincere, would not have justified an arrest. Giving full weight to the sergeant's testimony, nothing that he saw or otherwise learned through his senses during his visit, added anything to that belief or his right to act on it. Either supposition of belief amounted to no more than a "mere suspicion". In *Frantom v. State, supra,* it was held that the affidavit of a police chief that several known gamblers had been seen to enter a poolroom on a number of successive days, did not justify the issuance of a warrant to search the establishment in the belief that gambling and lottery were being committed on the premises. If those facts did not amount to probable cause to believe that gambling was there being committed, I cannot see how observing a known bookmaker with a betting slip in his possession amounts to evidence of anything more than that a misdemeanor has previously been committed. Any belief which the officer had as a result of seeing the slip, added up to no more than the same belief he had before he saw the slip, namely, that appellant had committed bookmaking in the past. Neither belief was based on facts showing a present violation of the law.

It seems evident that the trial court treated the possession of the notation of a bet as a violation of the book-

making statute and that, despite its disavowal, this Court in effect acted on the same premises. During the course of the trial, the lower court said to the jury: "The problem in this case, * * * is, did this defendant, was he engaged in lottery or possession of lottery or did he have records, etc., of bets?" In his charge to the jury, the court said: "* * * there are two questions of fact, and I will summarize those by saying that they are these. First, did the defendant have possession of a lottery slip? Second, did he have possession of records of horse race bets? If he did, you should find him guilty." Again, he said: "Here you have a case in which the defendant is charged with having had in his possession lottery slips and race horse bets * * *. If you believe that those papers were in the possession of the defendant, and were lottery slips in one case, and records of bets in the other case, then it is not necessary that you see the papers themselves." Finally, the court said: "Now the question for you is not whether the arrest was legal, it is this: whether the defendant had in his possession lottery slips in case 275, and bets on the races in case 276 * * *. If you are convinced in either case beyond a reasonable doubt that he did have such papers, you should find him guilty."

The counts of bookmaking which the State pressed were three. One, that appellant did bet and wager upon the result of a race; two, that appellant did become the depository of certain money to be bet in a certain manner upon the result of a certain race; and, finally, that appellant did record and register a bet or wager. These are the crimes which Code, 1951, Art 27, Sec. 306, prohibits— not the mere possession of the record of a bet. Certain statutes do this—see *State v. Johnson* (Conn.), 102 A. 2d 359, 362, and cf. *Parkes v. Bartlett* (Mich.), 210 N. W. 492. Yet, it is apparent to me that the trial court's continued preoccupation with the mere possession of race horse bets was effective, indeed decisive, in his decision that the arrest was legal. It would seem that he accepted

the testimony of the police sergeant that he saw the appellant in possession of the record of a race horse bet and held that this was the observation of a misdemeanor being committed. The charge, as a whole, in effect required the jury to find the defendant guilty merely if he had possession of a notation of a bet, which is not the law. The effect of the opinion of the majority is to give the blessing of this Court to these results.

This was a jury trial. One matter to which no exception was taken below, and which was neither argued nor dealt with in the opinion of the majority, seems to me to be important. The trial court, in his charge to the jury, said this: "I have ruled that the arrest of the defendant was legal, and you may disregard any question connected with the legality of that arrest, since it is my responsibility to determine whether or not the arrest was legal." Later in the charge, the court said: "Now the question for you is not whether the arrest was legal * * *." Undoubtedly, it was for the court in the first instance to rule whether the arrest was legal, because that determination governed the admissibility of vital evidence. The Constitution of Maryland, Art. XV, Sec. 5, still provides that in the trial of all criminal cases, the jury shall be the judges of the law as well as the facts. Whether the jury may be precluded from consideration of the legality of the arrest, dependent as it usually is, and was here, upon a question of fact or of credibility, seems to me far from clear and the charge of the court may well have been "plain error material to the rights of the accused", which, under Rule 6(g) of the Criminal Rules of Practice and Procedure, the Court of Appeals "of its own motion may take cognizance of and correct".

In case of a confession, the court must determine in the first instance whether or not it is freely and voluntarily made, and so is admissible. The ultimate question is for the jury. In *Linkins v. State,* 202 Md. 212, the Court said: "Of course, the question as to whether a confession is admissible in evidence is for the court alone.

\* \* \*. Admissibility does not signify that the evidence admitted has demonstrated or proved the fact to be proved, but merely that it is received by the tribunal for the purpose of being weighed with other evidence. Admissibility falls short of proof. The rule of law uttered by the judge, merely declares what is sufficient to go to the jury. \* \* \* This court has held in three recent cases that, although the question as to whether the confession is admissible in evidence is for the trial court, the ultimate facts as to whether it was freely and voluntarily made is for the jury."

The rule is the same in the case of a waiver of a statutory or constitutional right not to be searched. In *Payne v. State*, 207 Md. 51, 113 A. 2d 93, we quoted with approval the language of *Hubbard v. State,* 195 Md. 103, 107, as follows: "In a case like this, where the traverser testifies that the search was made over her objection, and the police officers testify that she permitted them to make the search, whether the fruits of the search should go to the jury is in the first instance a matter for the court. If the court is of the opinion that the accused freely and voluntarily consented to the search, and there was no coercion or fear brought to bear upon the traverser by the police, the matter should be submitted to the jury, and it is then for the jury to say, on all the facts, whether the traverser waived her right she might have to object to the search."

There would seem to be no difference in principle between the right of an accused to have the jury decide ultimately whether a confession was freely and voluntarily made or a waiver freely and voluntarily given, and his right to have it decide whether the officers saw a crime being committed in their presence.

I think the case should be reversed or, at the least, should be set down for reargument as to whether the arrest was legal and as to whether the court's charge to the jury did not contain plain errors material to (and prejudicial to) the rights of the appellant.

## PER CURIAM

(Filed December 5, 1955.)

On reargument the Court is of the opinion that the activity of the appellant in the presence of the arresting officer was not sufficient to amount to the commission of a misdemeanor in his presence, assuming all of his testimony to be true. As pointed out in the original majority and dissenting opinions, there was no evidence that any lottery slip was in view of the officers. With regard to the bookmaking charge, the evidence falls short of establishing that the appellant was engaged in any of the activities denounced by the statute (Code (1951), Article 27, Section 306)—specifically, receiving or recording or being a depository of any bet or wager— either by direct proof or by inferences reasonably to be drawn from the facts observed. There were no admissions by the appellant prior to his arrest. There was thus no proper basis shown for the arrest of the appellant and the evidence obtained by the subsequent search of his person was not admissible against him. Code (1951), Article 35, Section 5; *Davids v. State*, 208 Md. —, *infra*, 118 A. 2d 636, just decided, No. 38, October Term, 1955, and cases therein cited.

In view of the decision of the above question it is unnecessary to reconsider any of the other matters dealt with in the majority and dissenting opinions heretofore filed and in the reargument of the case.

Because of the present conclusion that the arrest of the defendant, without a warrant, on the charge of bookmaking, was not justified, the judgment of conviction is reversed and the case is remanded for a new trial, the costs to be paid by the Mayor and City Council of Baltimore.

*Judgment reversed and case remanded for a new trial; the costs to be paid by the Mayor and City Council of Baltimore.*