# ROBERT STUART LIICHOW v. STATE OF MARYLAND

[No. 89, September Term, 1979.]

*Decided September 10, 1980.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Reginald W. Bours, III,* with whom was *Laura K. Leizear* on the brief, for appellant.

*Thomas P. Barbera, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

ELDRIDGE, J., delivered the opinion of the Court. MURPHY, C. J., and SMITH and RODOWSKY, JJ., concur in part and dissent in part. MURPHY, C. J., filed an opinion concurring in part and dissenting in part at page 515 *infra,* in which SMITH and RODOWSKY, JJ., join.

Robert Liichow, the petitioner, was convicted in a nonjury trial in the Circuit Court for Washington County on nine counts of possession of several types of controlled dangerous substances. These substances had been kept in a plastic bag which, without a warrant, was seized and then searched by a Maryland State Police trooper while Liichow was moving his possessions from a rented dwelling. The issue presented

is whether the warrantless seizure and search of the plastic bag, in the circumstances of this case, violated petitioner's constitutional right to be free from an unreasonable search and seizure.

The following facts were introduced at a pre-trial suppression hearing. On August 11, 1977, in late morning, Liichow and his girlfriend were in bed in a rented house trailer when the girl's former boyfriend, displaying a gun, broke into the trailer, chased Liichow out of the trailer and into a field, and fired a shot at him. Liichow ran to the trailer owner's house and requested that the owner call the police. Trooper Twigg of the Maryland State Police responded.

With the disturbance over, Liichow and his girlfriend assented to the trailer owner's request that they leave the trailer and began packing their possessions into the girlfriend's car. Although Trooper Twigg had left the site while the packing was going on, he returned when the owner reported another disturbance between Liichow and the former boyfriend. The second disturbance had subsided by the time Twigg arrived. After Twigg's arrival for the second time, the police officer told Liichow that he could never come back onto the property. According to Twigg's testimony, Liichow then received Twigg's permission to retrieve some "personal belongings" behind the trailer. When Twigg started to accompany him, Liichow requested that Twigg not follow him. Although Twigg, having been told of the incident with the gun and that Liichow had previously had a knife to defend himself, testified that he was concerned about possible weapons, nevertheless the police officer permitted Liichow to go behind the trailer alone.

Trooper Twigg testified that Liichow, when he returned from behind the trailer, was carrying a large plastic bag, about eighteen inches square, "and he had this bag crumpled together on top of the open end and it was wrapped around his arm and he was holding it with the other arm." Twigg's testimony continued:

"When he come around to the front of the trailer he

come back this side to get in the car, that is when I approached him and requested to see in the bag. He refused and as he went to the car and attempted to enter the car, the bag fell from his arm and he fell down and he was holding it with the top of it and as he got into the car, I was still concerned about the bag and I was probably no more than five feet from him and I could see as he got into the car, I could see some white tablets down in the bottom of the bag. There was a group of them. They looked like they were in another bag, what I could see but they were in a tight group. I would estimate probably fifty tablets. They were white tablets size, approximately the size of a dime."

Later, Trooper Twigg again explained how he came to see the white tablets:

"Mr. Liichow was in the car, or was getting in the car when I saw the tablets; he wasn't completely in the car, he was getting in the car and in his movement to get into the car, the bag come loose from his arm and he was holding on to the bag and he went on and reached and got in the car and that is when I saw the tablets. And as he was getting in the car I approached him and reached for the bag and he took it from this hand to this one and tried to get it down under the front seat."

When Liichow attempted to put the plastic bag under the car seat, Twigg reached into the car and grabbed the bag. As to the nature of the plastic bag, Trooper Twigg testified that it was "not completely clear; it was cloudy." However, the officer stated that he "could see through the plastic bag."

After seizing the plastic bag, Twigg opened it. He stated that the white tablets, which he had previously observed, were in a completely clear "small plastic bag, like a small sandwich bag . . . down inside of the large bag." The plastic bag also contained nontransparent brown paper bags, which in turn contained several types of tablets, capsules and some

brown leafy matter. Additionally, the large plastic bag contained personal articles.

Twigg "suspected" that the white dime size tablets, the other tablets and capsules, and the leafy matter, were all controlled dangerous substances. Subsequently, Liichow was taken to the police barracks, and, when tests verified that the tablets, capsules and leafy matter were controlled dangerous substances, Liichow was formally charged.

At the suppression hearing, on cross-examination, Twigg testified that during his ten years as a trooper, he had normally been assigned to traffic patrol. He was questioned concerning the basis for his suspicion that the white tablets were controlled dangerous substances:

"Q. Had you ever seen tablets like that before?

A. I had seen . . .

Q. Had you ever seen tablets like that before in your life?

A. I have.

Q. All right, what were they?

A. CDS — controlled dangerous substance.

Q. What CDS?

A. I'm not familiar with the names, the specific names or anything.

Q. Trooper, isn't it true that you never made a narcotic arrest in your life, except two or three times for marijuana.

A. For marijuana, right.

Q. In all your ten years?

A. I have been in on investigations on other, on other narcotic arrests, assisting other Troopers.

Q. Now, [tell] the Court what those white tablets were? What did you suspect they were?

A. They, I suspected they were some type of controlled dangerous substance.

Q. What type?

A. Beyond me.

Q. You had no idea what those type of tablets were and isn't that the truth?

A. I didn't know exactly what they were, but I suspected them to be . . .

Q. But you suspected them based on what?

A. From my knowledge as the training I received on my job, the training, the booklets, classroom training on narcotics . . .

Q. Based on your training and your knowledge, what did you suspect those white tablets were?

A. I could not say exactly what they were.

Q. You couldn't say exactly . . .

A. I knew they were some type of controlled dangerous substance.

Q. Well, what type?

\* \* \*

"A. They looked similar to some other pills that I have seen, some other tablets that I have seen were CDS and at that time that is all I needed to go on."

Shortly thereafter, the testimony continued as follows:

"Q. Did you know at that time whether or not they were prescription drugs or not?

A. At that time, no.

Q. Did you know at that time whether or not they were patent medicine? Do you know what I mean when I say 'patent medicine,' don't you? In other words counter medicine?

A. I didn't know what they were other than I suspected them to be CDS, because they did appear, pictures of other tablets that I have seen in books and the training we got, they looked similar to other tablets that I have seen.

They weren't ... that is the only thing I can say."

On his own behalf, Liichow testified that the plastic bag was opaque. Further, he testified that all of the drugs were completely inside a brown paper bag, which was inside the plastic bag. Thus, he contended that there "was nothing visible" and that it was impossible to see anything in the bag.

The trial judge, crediting Twigg's testimony, concluded that Twigg had probable cause to seize and search the bag. The court denied the motion to suppress the evidence. At the subsequent trial, the parties submitted the case to the trial court solely on the basis of the transcript of the pre-trial suppression hearing and an earlier preliminary hearing, and Liichow was convicted.

In an unreported opinion, the Court of Special Appeals affirmed, holding that the circumstances were sufficient to satisfy the "automobile exception" to the requirement that searches and seizures be performed pursuant to a warrant. The intermediate appellate court concluded that, because Liichow was leaving the area, exigent circumstances were established. As to the probable cause, the Court of Special Appeals noted that the trial court, as the finder of fact charged with resolving credibility and disputed factual issues, was entitled to believe Twigg's testimony. Consequently, the intermediate court concluded that Twigg's having seen the white tablets, in addition to the other circumstances in the case, constituted probable cause to believe that the plastic bag contained contraband.

This Court then granted Liichow's petition for a writ of certiorari which presented the following questions:

"1. Whether probable cause existed for the warrantless seizure of certain controlled dangerous substances where a police officer with slight training or experience as to drugs observed only that Petitioner was carrying a bag containing 'white tablets, dime sized.'

"2. Whether the observations of the police officer were tainted by his conduct in requiring Petitioner to remove his personal belongings from leased premises without an eviction notice or formal legal proceedings of any kind.

"3. Whether the subsequent search of a plastic bag described by Petitioner as containing his personal property required the obtaining of a search warrant under the rationale of *Arkansas v. Sanders,* 442 U.S. 753, 99 S. Ct. 2586, 61 L. Ed. 2d 235." [1]

In our view, Liichow's convictions must be reversed on the basis of the third question presented, namely that the warrantless *search* of the large plastic bag was invalid under the rationale of *Arkansas v. Sanders,* 442 U.S. 753, 99 S. Ct. 2586, 61 L. Ed. 2d 235 (1979). Consequently, we shall assume, without deciding, that in the circumstances of this case Trooper Twigg had probable cause to *seize* the large plastic bag under the so-called "automobile exception" to the requirement of a warrant.[2] Furthermore, in light of our holding, we need not discuss the second issue raised in the certiorari petition.

In *Arkansas v. Sanders, supra,* the Supreme Court made it clear that the mere existence of probable cause to stop an

1. The questions presented did not limit the scope of the search and seizure issues to the Fourth Amendment to the United States Constitution. Therefore we shall treat the contentions as being grounded on both the Fourth Amendment and Article 26 of the Maryland Declaration of Rights. Although the wording of Article 26 is somewhat different than that of the Fourth Amendment, this Court has taken the position that Article 26 is generally in *pari materia* with the Fourth Amendment and similarly prohibits unreasonable searches and seizures. Merrick v. State, 283 Md. 1, 4 n. 2, 389 A.2d 328 (1978); McChan v. State, 238 Md. 149, 158, 207 A.2d 632 (1965), *cert. denied sub nom.* Jones v. State, 384 U.S. 1021, 86 S. Ct. 1929, 16 L. Ed. 2d 1022 (1966); Blum v. State, 94 Md. 375, 51 A. 26 (1902). *See also* Givner v. State, 210 Md. 484, 124 A.2d 764 (1956); Lambert v. State, 196 Md. 57, 75 A.2d 327 (1950); Bass v. State, 182 Md. 496, 35 A.2d 155 (1943).

2. As to the "automobile exception," *see, e.g.,* Arkansas v. Sanders, 442 U.S. 753, 760, 99 S. Ct. 2586, 61 L. Ed. 2d 235 (1979), Coolidge v New Hampshire, 403 U.S. 443, 458-462, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971); Chambers v. Maroney, 399 U.S. 42, 48-52, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970); Carroll v. United States, 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925); Duncan and Smith v. State, 281 Md. 247, 254-255, 378 A.2d 1108 (1977); England and Edwards v. State, 274 Md. 264, 269-274, 334 A.2d 98 (1975).

automobile and seize certain contents from the vehicle, thereby bringing the seizure within the "automobile exception" to the warrant requirement, did not validate the warrantless search of the contents themselves. The Court refused to "extend *Carroll* [*i.e.,* the automobile exception] to allow warrantless searches of everything found within an automobile, as well as of the vehicle itself." 442 U.S. at 762. In *Sanders,* the police, having probable cause to believe that the defendant was carrying marijuana in a suitcase, stopped the automobile in which he was riding, searched the vehicle, and seized and searched the suitcase, discovering the marijuana. The Supreme Court took the position that the police, acting on probable cause to believe that the taxi contained contraband, had validly stopped and searched the vehicle and seized the suitcase, 442 U.S. at 761. The Court, however, held that the subsequent search of the suitcase was invalid. As the Court explained (*id.* at 763-764):

> "A closed suitcase in the trunk of an automobile may be as mobile as the vehicle in which it rides. But . . . the exigency of mobility must be assessed at the point immediately before the search — after the police have seized the object to be searched and have it securely within their control. . . . *Once police have seized a suitcase . . ., the extent of its mobility is in no way affected by the place from which it was taken.* Accordingly, as a general rule there is no greater need for warrantless searches of luggage taken from automobiles than of luggage taken from other places." (Emphasis added.)

At issue in *Sanders* was a suitcase, an item of personal luggage. The Court observed that such an item was "a common repository for one's personal effects, and therefore is inevitably associated with the expectation of privacy." *Id.* at 762. The Court further pointed out (*id.* at 764-765 n. 13):

> "Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some

containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance. Similarly, in some cases the contents of a package will be open to 'plain view,' thereby obviating the need for a warrant."

Thus, according to the Court, "the extent to which the Fourth Amendment applies to containers and other parcels depends not at all upon whether they are seized from an automobile." *Id.* at 765 n. 13.

Consequently, the validity of Twigg's search of the plastic bag depends on whether Liichow had a constitutionally protected expectation of privacy in the bag. The traditional test for determining whether a person's interest in personal property is constitutionally protected from an unreasonable search is whether he has an actual expectation of privacy in the property, and whether that expectation is one which society would recognize as reasonable. *Arkansas v. Sanders, supra,* 442 U.S. at 765; *Smith v. Maryland,* 442 U.S. 735, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979), *affirming Smith v. State,* 283 Md. 156, 389 A.2d 858 (1978); *Rakas v. Illinois,* 439 U.S. 128, 143-144 n. 12, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978); *Venner v. State,* 279 Md. 47, 367 A.2d 949, *cert. denied,* 431 U.S. 932, 97 S. Ct. 2638, 53 L. Ed. 2d 248 (1977).

In *Morton v. State,* 284 Md. 526, 397 A.2d 1385 (1979), the defendant had been carrying a plastic bag containing a gun, marijuana and some photographs. He placed the bag on the floor, along the side, of a basketball court in a recreation center while he was apparently playing basketball. The police, after arresting the defendant, found the plastic bag and searched it without obtaining a warrant. In holding that the warrantless search was invalid, this Court expressly held that the defendant had a reasonable expectation of privacy in the contents of the plastic bag and that the defendant had not relinquished this expectation of privacy by placing the bag on the floor, 284 Md. at 531-532. Chief Judge

Murphy there concluded for the Court (*id.* at 533, emphasis supplied):

> "We think the appellant *had a reasonable expectation of privacy in the contents of the* jacket and *plastic bag* while he was inside the recreation center, and that nothing which he said or did evidenced an intent to abandon his protected privacy interest in these belongings. We hold that the appellant's fourth amendment claim to privacy from governmental intrusion was reasonable and that the search of the jacket and plastic bag was unlawful."

Turning to the instant case, we conclude that the defendant Liichow also had a constitutionally protected expectation of privacy in the plastic bag. He plainly had an actual expectation of privacy in the bag and its contents, as was demonstrated by his request to be left alone when he went to get it, by his refusal to let Trooper Twigg examine it, and by the protective manner in which he carried it. Moreover, his expectation was not an unreasonable one. As we recognized in *Morton,* one's expectation of privacy in a plastic bag may, in appropriate circumstances, be constitutionally protected. In this case, Liichow was moving from the trailer, and he used the bag to carry personal belongings just as one might use any other type of container to transport his personal belongings. It would be normal in such circumstances to use a plastic bag to carry and load personal belongings into a car as part of a move from residential premises. Furthermore, as in *Morton,* there were personal items inside the plastic bag other than the controlled dangerous substances. Consequently, we hold that the plastic bag could not be searched without a warrant. Therefore, the controlled dangerous substances found as a result of the unlawful search should not have been admitted in evidence.

The State in its brief suggests that the search was proper because the white dime-size tablets "had already been observed in open view by the police officer." The State is apparently relying upon a different exception to the warrant

requirement, namely the so-called "plain view exception." It is doubtful if this issue is encompassed by the questions presented in the certiorari petition, and the State filed no cross-petition for a writ of certiorari. Thus, the issue would not appear to be before us under Maryland Rule 813 a. However, assuming arguendo that the issue is before us, we find no merit in the State's suggestion.

The Supreme Court in *Coolidge v. New Hampshire, supra,* 403 U.S. at 466, stated concerning this exception to the requirement of a warrant:

> "What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification — whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused — and permits the warrantless seizure. *Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them;* the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." (Emphasis added.)

The above-quoted requirement for invoking the plain view doctrine was not met here.

Trooper Twigg's statement, that he could see white pills at the bottom of a non-transparent bag, is not sufficient to meet the standard that it must be "immediately apparent to the police that they have evidence before them." Even assuming arguendo that Twigg could have gotten a reasonably clear view of the white tablets under the conditions here, merely seeing dime-size white tablets among personal belongings does not make it *immediately apparent* that the viewer has before him *evidence* of criminal conduct.

It is true that in some situations, a trained policeman's observation of certain types of capsules, powders, etc., has been deemed sufficient to meet the requirements of the plain view doctrine. But to say that dime-size white tablets taken from the area of one's residence, without corroborating circumstances, constitute apparent evidence of a crime, is certainly to relax the standard set forth in *Coolidge v. New Hampshire, supra.* Literally thousands of small white tablets are manufactured by pharmaceutical firms. Various lawful common white tablets are about the size of a dime, such as many brands of antacid tablets, high blood pressure tablets, vitamin tablets, etc. The presence of these tablets among one's personal belongings, without more, is simply not a reasonable basis for a warrantless seizure.

An instructive case is *State v. Elkins,* 245 Or. 279, 422 P.2d 250 (1966), where a police officer, in the course of lawfully searching the defendant's person for a weapon, found an unlabeled bottle containing, *inter alia,* white tablets. The defendant appeared to be intoxicated at the time, and the officer testified that he was suspicious of the white tablets. The officer seized the tablets; they turned out to be methadone; and the defendant was convicted of illegal possession of narcotics. In reversing and holding that the warrantless seizure of the tablets could not be upheld under the plain view theory, the Supreme Court of Oregon stated (422 P.2d at 254):

"The officer had no information from which it was reasonable to assume that the pills might be contraband. The conclusion to be drawn from the evidence was that the officer was acting on suspicion. It is not enough that the officer suspects in good faith, his suspicion must be reasonable. In the hearing before the judge and out of the presence of the jury on the propriety of the seizure, there was no evidence that the defendant was known to the officer to be an habitual narcotics user; that the officer was familiar with the actions of persons under the influence of narcotics and the defendant's actions were similar; that he was familiar with the

appearance of methadone pills and these were similar; that he had been informed by reliable sources that the defendant was in possession of narcotics; nor was there any other type of evidence which is usually used to justify an arrest without a warrant and a resulting seizure. The seizure was unreasonable."

The same absence of information corroborating Twigg's suspicion, that the white pills were controlled dangerous substances, existed in the case at bar. This is clearly demonstrated by Twigg's testimony at the suppression hearing, as previously set forth. *See also State v. Meichel,* 290 So. 2d 878 (La. 1974) (police officer's seeing pills in a bottle on the front seat of an automobile held not within the plain view doctrine); *State v. McCrea,* 22 Wash. App. 526, 590 P.2d 367 (1979).

In sum, the warrantless search of the large plastic bag cannot be justified under any of the contended for exceptions to the requirement of a search warrant. The search violated the Fourth Amendment and Art. 26 of the Maryland Declaration of Rights, and the evidence obtained should have been suppressed.

> *Judgment of the Court of Special Appeals reversed, and case remanded to that court with instructions to reverse the judgment of the Circuit Court for Washington County and remand the case for a new trial.*
>
> *Costs to be paid by Washington County.*

*Murphy, C. J., concurring in part and dissenting in part:*

I agree with the Court that Liichow had a constitutionally protected expectation of privacy in the plastic bag under the facts of this case, and that under *Arkansas v. Sanders,* 442 U.S. 753, 99 S. Ct. 2586, 61 L. Ed. 2d 235 (1979), the plastic

bag, while it was lawfully seized, could not be searched without a warrant. This is so under *Sanders* because Liichow was using the plastic bag as a common repository for his personal effects, akin to a personal luggage carrier, such as a suitcase or a footlocker, which is invariably associated with an expectation of privacy. *See United States v. Chadwick,* 433 U.S. 1, 97 S. Ct. 2476, 53 L. Ed. 2d 538 (1977). Consequently, for the reasons so well articulated by the Court, the illegal drugs seized from the nontransparent brown bags found within the plastic bag were improperly admitted in evidence at the trial. Reversal of eight of the nine counts of possessing various controlled dangerous substances is therefore clearly correct.

The fifty white dime-sized tablets observed by Trooper Twigg before he seized the bag were not, however, taken as a consequence of an unlawful search. As to them I would affirm the conviction of that count of the criminal information charging Liichow with their unlawful possession.

The record discloses that after Liichow had removed his personal belongings from the trailer and packed them into Young's car, he asked Trooper Twigg whether he could retrieve other personal items which he had "hidden" behind the trailer. After Twigg had given his assent, Liichow refused the trooper's request that he be permitted to accompany Liichow behind the trailer. When Liichow emerged from behind the trailer, he was carrying the plastic bag in a guarded fashion, to prevent Twigg from seeing into or through it. When the bag fell from Liichow's arm, and its contents were partially exposed, Twigg was standing next to the bag and he said that he observed approximately fifty white dime-sized tablets in a small clear "baggie" at the bottom of the plastic bag. Based on his police training and experience of some ten years, Twigg believed the tablets to be a controlled dangerous substance. Before he could seize the plastic bag, Liichow jumped into Young's car and attempted to put the bag under the seat. Without hesitation, reflecting Twigg's knowledge that he had observed controlled dangerous substances, the trooper reached inside the car and seized the plastic bag.

The trial judge, believing Twigg's testimony, found that Twigg had probable cause to seize the plastic bag and to search it. The court said that when the plastic bag was exposed to Twigg's view, the trooper "could see some small white pills" and that "[f]rom prior training, he could observe that they were about the size of CDS [controlled dangerous substance] or other drug." In concluding that the seizure of the plastic bag and its subsequent search was lawful, the trial judge considered "the totality of evidence with the pistol being fired, the shot gun in the trailer and the missing knife, coupled with the fact that the Defendant told the Officer he had a package secreted behind the trailer, and the fact that the Trooper, himself, observed a package with white pills in it." [1]

I think there was legally sufficient evidence before the trial judge to support his determination that Trooper Twigg had probable cause to believe that the dime-sized white pills which he observed in the clear "baggie" inside the plastic bag were controlled dangerous substances. Considering the events necessitating the trooper's presence at the scene, Liichow's furtive conduct in going behind the trailer to retrieve the personal belongings which he had there "hidden," and Liichow's effort to conceal the contents of the plastic bag from the officer's view, Twigg's suspicion that a weapon or some kind of contraband was contained in the plastic bag was plainly justified. After Liichow dropped the bag and the white pills inside the plastic bag became clearly visible to Twigg, his police training and experience in narcotics identification and investigation led him to conclude that the pills were controlled dangerous substances. While the trooper's experience with narcotics was not extensive, and he was unable to name the precise controlled dangerous substance contained in the tablets, I think the basis for his conclusion was adequate to furnish the requisite measure of probable cause.

The evidence showed that Twigg had been previously

---

1. In addition to the knife, which Liichow said he had in his possession to defend himself against his assailant, he also had packed a shotgun into Young's car.

involved in five narcotics cases and had received classroom training in identifying controlled dangerous substances. He testified that the white dime-sized tablets looked similar to other pills that he had seen in books and pamphlets used in police training courses to familiarize officers with various illegal drugs.

The cases hold that whether a police officer possesses probable cause to seize contraband drugs is measured by the extent of his training and experience in narcotics investigation or identification. *See, e.g., Johnson v. United States,* 333 U.S. 10, 13, 68 S. Ct. 367, 92 L. Ed. 436 (1948) (probable cause may be based on distinctive odor where officer is "qualified to know the odor"); *United States v. McCormick,* 468 F.2d 68 (10th Cir. 1972), *cert. denied,* 410 U.S. 927 (1973); *United States v. Wheeler,* 459 F.2d 1228, 1229 (D.C. Cir. 1972); *Schraff v. State,* 544 P.2d 834, 847 (Alaska 1975); *Wimberly v. Superior Court of San Bernardino Cty.,* 16 Cal. 3d 557, 547 P.2d 417, 128 Cal. Rptr. 641 (1976) (en banc); *State v. Jackson,* 263 La. 849, 269 So. 2d 465, 468 (1972); *Ford v. State,* 37 Md. App. 373, 377 A.2d 577 (1977); *Peterson, Deal & Hunt v. State,* 15 Md. App. 478, 486, 292 A.2d 714, *cert. denied,* 266 Md. 735 (1972). *See also Spriggs v. State,* 226 Md. 50, 171 A.2d 715 (1960) (expertise in investigating lottery cases relevant to officer's ability to interpret lottery slips); *Le Faivre v. State,* 208 Md. 52, 116 A.2d 368 (1954) (expertise in bookmaking operations relevant to officer's ability to determine whether bookmaking was taking place). *See generally* 1 W. LaFave, *Search and Seizure, A Treatise on the Fourth Amendment* § 3.2 (1978).

The trial judge, assessing the substance and credibility of Twigg's testimony, believed what he said and that it mounted up to a showing of probable cause, conclusions which we should accept, fully supported as they are by the record.

In the circumstances, therefore, the fifty white dime-sized tablets were not seized as a consequence of an unlawful search. They were observed inside the plastic bag by Twigg prior to his seizure of the bag from Young's car and they

were properly admitted in evidence under the "plain view" exception to the warrant requirement. That doctrine, when applicable, permits a seizure of evidence in plain view without a warrant. *Arkansas v. Sanders,* 442 U.S. 753 (n. 13), 99 S. Ct. 2586, 61 L. Ed. 2d 235 (1979); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971). As the Court stated in *Harris v. United States,* 390 U.S. 234, 236, 88 S. Ct. 992, 19 L. Ed. 2d 1067 (1968), "objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." The plain view doctrine, as articulated in *Coolidge,* requires the concurrence of four elements: (1) the police have a prior justification for the intrusion; (2) they find the evidence in plain view; (3) they find it inadvertently; and (4) it is immediately apparent to the police that they have evidence before them. *See State v. Wilson,* 279 Md. 189, 195, 367 A.2d 1223 (1977). The fourth element, we said in *Wilson, id.* at 195, requires only that the police have probable cause to believe the evidence is incriminating before they seize it.

Since Twigg was lawfully on the premises in the course of his police duties, and was not searching for evidence when he observed the white pills in plain view in the plastic bag, the first element — a previously justified intrusion — is plainly satisfied. The remaining elements are also satisfied — the white pills were in plain view, their observation was inadvertent, and there was probable cause to believe that the pills were controlled dangerous substances. The admission in evidence of the white dime-sized tablets was therefore entirely proper.

Notwithstanding our holding in *Wilson,* the majority somehow concludes that the fourth element of the *Coolidge* plain view formulation requires a greater measure of probable cause than that traditionally required in fourth amendment cases. This is readily evident because the majority opinion assumes from the outset that Twigg had probable cause to seize the plastic bag under the automobile exception.

Involved in *Wilson* was whether a police officer, in executing a search warrant for narcotics, had independent probable cause to believe that certain stereo and recording equipment which he observed was stolen. The officer recorded the serial numbers of the equipment, and it was later ascertained that the equipment had been stolen. We rejected the argument that the seizure of the serial numbers was lawful under the plain view exception to the warrant requirement. We said that the fourth element of *Coolidge* had not been satisfied because at the time the officer copied the serial numbers, it was not "immediately apparent" to him that he had "evidence" before him. With Judge Levine speaking for the Court, we outlined the breadth of this element of the plain view doctrine as follows:

> "[I]t was not 'immediately apparent to the police that they [had] evidence before them.' *This element, in essence, amounts to a requirement that police have probable cause to believe the evidence is incriminating before they seize it.* As the court said in *United States v. Gray, supra,* 484 F.2d at 356, '[I]t must be "immediately apparent" to the police that the object is in fact incriminating or the seizure of the object would be without probable cause and would turn the search into a general or exploratory one.' *Accord, United States v. Clark, supra,* 531 F.2d at 932; *United States v. Wilson, supra,* 524 F.2d at 598-99; *United States v. Truitt,* 521 F.2d 1174, 1176 (6th Cir. 1975); *see United States v. Golay,* 502 F.2d 182, 184-86 (8th Cir. 1974). Stated another way, to be subject to seizure, the object must be one for which the police could have obtained a warrant because they had probable cause. *Coolidge v. New Hampshire, supra,* 403 U.S. at 467-68.
>
> "In the context of another exception to the warrant requirement, the 'hot pursuit' doctrine, the Supreme Court has indicated what information a police officer must possess before he can be said to have probable cause to seize evidence:
>
> '... There must, of course, be a *nexus* —

automatically provided in the case of fruits, instrumentalities or contraband — *between the item to be seized and criminal behavior.* Thus in the case of "mere evidence," probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction.' *Warden v. Hayden,* 387 U.S. 294, 307, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (1967) (emphasis added).

This standard has also been used to determine whether probable cause existed to seize articles in plain view. *See, e.g., United States v. Golay, supra,* 502 F.2d at 185; *United States v. Maude,* 481 F.2d 1062, 1071-72, n. 73 (D.C. Cir. 1973). *See also United States v. Sedillo,* 496 F.2d 151, 152-53 (9th Cir.) (Hufstedler, J., dissenting), *cert. denied,* 419 U.S. 947 (1974).

"In *Hayden,* of course, the Court held that mere evidence, as well as fruits, instrumentalities, and contraband, may be seized under certain circumstances. Under the *Hayden* formulation, so long as police have probable cause to believe that what they see is contraband, or the fruit or instrumentality of some unspecified criminal activity, they may seize the object. *See, e.g., United States v. Golay, supra,* 502 F.2d at 184-86 (fruits and instrumentalities); *United States v. Canestri,* 518 F.2d 269, 274-75 (2d Cir. 1975) (contraband); *United States v. Lopez-Ortiz,* 492 F.2d 109, 111 (5th Cir. 1974) (contraband). Where, however, they possess probable cause to believe that the object is mere evidence, officers may seize it as an aid in a particular apprehension or conviction. *See, e.g., Mapp v. Warden, N.Y. State Corr. Inst., Etc.,* 531 F.2d 1167, 1172 (2d Cir. 1976); *United States v. Jones,* 518 F.2d 384, 390-92 (7th Cir.) (Swygert, J., dissenting), *cert. denied,* 423 U.S. 997 (1975); *United States v. Damitz,* 495 F.2d 50, 56 (9th Cir. 1974). These standards furnish guidelines to deter-

mine the ultimate issue, *whether an officer of reasonable caution would be warranted in believing that an offense is being or has been committed and that the object is evidence incriminating the accused. United States v. Truitt, supra, 521 F.2d at 1177.*" 279 Md. at 195-97 (emphasis supplied).

The majority relies upon *State v. Elkins,* 245 Or. 279, 422 P.2d 250 (1966), a case in which application of the plain view doctrine was rejected. On the facts of that case, however, the officer was acting on mere suspicion, rather than upon probable cause. That mere suspicion is not the equal of probable cause is everywhere acknowledged. There was a total absence in *Elkins,* unlike the present case, of facts from which to credit the officer's testimony that he was familiar with controlled dangerous substances and their appearance.

Finally, the majority finds it "doubtful" that the State may rely on the "plain view" doctrine because that issue was not encompassed by the questions presented in Liichow's certiorari petition, and the State filed no cross-petition for a writ of certiorari. Maryland Rule 813 a provides:

"In cases where a decision has been rendered by the Court of Special Appeals or by a circuit court on appeal from the District Court, this Court will ordinarily consider only the issues which have been raised in the petition and any cross petition for certiorari and which have been preserved for appellate review, unless otherwise provided by the order granting the writ of certiorari."

A review of the third question presented by Liichow in his petition for certiorari, together with the State's answer thereto, discloses that the plain view exception to the warrant requirement, implicated in *Arkansas v. Sanders, supra,* was an issue encompassed by our grant of certiorari, and thus was properly invoked by the State in this case.

Judges Smith and Rodowsky have authorized me to state that they join in this opinion.